[No. A111602. First Dist., Div. Three. July 6, 2007.]

AVIATION DATA, INC., et al., Plaintiffs and Respondents, v. AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., et al., Defendants and Appellants.

[No. A114182. First Dist., Div. Three. July 6, 2007.]

WILLIAM D. HOFFMAN et al., Plaintiffs and Respondents, v. AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., et al., Defendants and Appellants.

1524

**COUNSEL**

Bartko, Zankel, Tarrant & Miller, John J. Bartko, Charles G. Miller, Christopher D. Sullivan, Jae S. Yi; Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., and Steven L. Mayer for Defendants and Appellants.

Law Offices of David M. Fried, David M. Fried; Phillips, Greenberg & Hauser, Theodore W. Phillips; Folkenflik & McGerity and Max Folkenflik for Plaintiffs and Respondents.

OPINION

SIGGINS, J.—May a party lose its contractual right to compel arbitration if, when negotiating and seeking approval of a class action settlement, it misrepresents the benefits of the proposed settlement to the court, opposing counsel and others? Here the trial court refused to approve a class action settlement when it concluded that counsel for defendant American Express Travel Related Services Company, Inc. (Amex), misled plaintiffs in the course of negotiations by offering to make significant modifications to its travel insurance program that, unbeknownst to plaintiffs, it had already made for reasons unrelated to the lawsuit. We hold the court did not err in ruling that due to its misleading conduct, Amex lost its right to compel arbitration. Accordingly, we affirm.

## BACKGROUND

Amex offers flight and baggage insurance programs, under which cardholders are automatically charged a premium from $4 to $14 for each flight they charge. In September 2001, William D. Hoffman sued Amex on behalf of the general public of California under the California unfair competition law. (Bus. & Prof. Code, §§ 17200, 17500.) The complaint, as ultimately amended,[1] alleged that Amex represented to card members enrolled in its flight and baggage insurance programs that it would bill them for travel insurance only when they actually flew and that it would refund or credit premiums assessed for cancelled flights and unused tickets. Instead, the complaint alleged, Amex engaged in a scheme to cheat and defraud its cardholders by assessing premiums for trips it knew were never taken; intentionally designed its billing practices, procedures and computer programs to bill customers for services they did not receive or use and to double-bill for the same service; and intentionally failed to issue refunds or credits on cancelled flights or unused tickets. Plaintiffs further alleged Amex deliberately exploits the fact that many cardholders do not notice that promised refunds never materialize, and improperly places the burden on millions of cardholders to apply for individual refunds, knowing that most will not apply.

A key issue in early discovery was whether it was technically possible for Amex to modify or reprogram its computer system to prevent many of the improper premium charges. Plaintiffs deposed Amex's director of systems development, Scott Butler, whom it designated as the person most knowledgeable about its computer system for travel insurance programs. At his

---

[1] The fourth amended complaint is the operative pleading. For reasons largely not pertinent here, Hoffman was ultimately dismissed and Greg Carr, Christina Modenius and Aviation Data, Inc. (ADI), were added as plaintiffs. For convenience and clarity, we will refer to the representative plaintiffs jointly as "plaintiffs" unless there are specific reasons to distinguish between them.

November 20, 2002, deposition, Butler and Scott Pearson, Amex's lead counsel, claimed that transaction processing for the travel insurance programs did not utilize the transaction advice addendum record (TAA code), a travel industry code that in many cases distinguishes between flight and nonflight charges, in order to help identify charges that should trigger an insurance premium. Both Butler and Pearson denied that Amex's computer system could be reprogrammed to identify improper charges by employing TAA codes or to automatically refund improperly assessed charges. Their denials were false because the weekend before the deposition, after considerable planning, Amex started using the TAA code to identify improper charges on the insurance programs that were the subject of the lawsuit. Amex had also been using the TAA code on its separate "hospital cash" insurance program since 2000.

Unaware of the facts surrounding Amex's deployment of the TAA code, plaintiffs urged Amex to begin screening improper charges and provided them with draft computer code that would accomplish that purpose. In or around January 2003, Amex vice-president and chief litigation counsel Stuart Alderoty agreed to research the capabilities of the Amex computer systems in order to evaluate whether the proposed new TAA screen and an automated refund procedure could be put in place. On February 18, 2003, Amex informed class counsel that Amex "is prepared to use" the TAA code "as an additional criterion that must be satisfied before a premium is charged. . . . While this may result in premiums not being charged for some miscoded flight charges, coverage still would be provided for an otherwise valid claim where a premium is not charged due to the miscoding. This would reduce the number of occasions on which a premium is triggered for miscoded charges. As you know, this is a change suggested by your expert witness." The modification of Amex's computer system to deploy TAA code became a principal anticipated benefit of settlement.

In March 2003, successful mediation resulted in the parties' agreement to the terms of a settlement that contemplated amendment of plaintiffs' complaint to allege a nationwide settlement class.[2] Plaintiffs believed from information obtained in discovery that Amex's computer systems could not be modified to identify past improper charges, and the settlement therefore did not provide any monetary recovery to class members. Instead, its key terms were Amex's prospective agreement to use the TAA code to screen improper charges; automatically refund premiums for unused tickets; raise the minimum amount that would trigger a premium from $40 to $75; and modify its refund coupons and disclosures. Amex promised to make the necessary

---

[2] The terms included that plaintiffs would file an amended complaint alleging their claims on behalf of a nationwide class.

modifications to its computer systems by the later of June 30, 2004, or 210 days after the settlement became a final and binding judgment.

In fact, despite Butler's sworn statement that "[a]s part of the proposed settlement American Express will begin using a second code known as the TAA" and similar representations by Amex in support of the settlement, Amex had been using the TAA code in its flight insurance program since November 2002. Sometime between the March 2003 mediation and July 6, 2003, Pearson learned that the TAA code had already been implemented. Pearson later testified he was "taken aback" by this information "because I thought it was a change. I thought it was new" when it was discussed at the mediation. He discussed with his supervising attorney, Julia Strickland, and with Alderoty his discovery that the TAA code was already in use, and its implications on the impending settlement. He did not, however, relate his discovery to plaintiffs' counsel. Pearson testified that plaintiffs should have learned the TAA code was already in use by examining the computer code Amex produced in discovery,[3] and from Amex's revisions to a draft settlement that changed language from "American Express will *modify* its computer code" to "*use and/or modify*." (Italics added.)

Settlement negotiations continued over the next few months. On August 4, 2003, the parties signed a settlement stipulation that was filed with the court the next day. A preliminary approval hearing was conducted on August 7, 2003. The trial court questioned Amex's counsel about the benefits of the settlement: "The Court: It seems that this settlement contemplates some substantive changes in the way that American Express operates this program, this insurance program. It also seems that the advantage and benefit that is conferred upon this class is in the form of those changes prospectively in the operation of its program and that there's no refund or monetary benefit that would be directly disbursed to the class; is that a fair statement?" Pearson responded: "That's correct." The court preliminarily approved the settlement and gave plaintiffs permission to file an amended nationwide class action complaint and set a final approval hearing for January 27, 2004. Solely for purposes of the settlement, the court certified a class of "All persons or entities who incurred per-trip premium charges in connection with their enrollment and participation in the airflight insurance, baggage insurance and/or travel delay insurance programs . . . at any time between September 1, 1997 and the date of preliminary approval of the settlement."

Plaintiffs filed their amended complaint that day, to allege a nationwide class action and add Carr as a class representative. The court approved a form of class notice as agreed by the parties in the stipulation of settlement. It stated: "If the settlement is approved, Amex will modify certain computer

---

[3] Amex's computer expert later contradicted this.

code to reduce the need for Program participants to request premium refunds in three ways: (1) Amex's computer systems will not charge a premium when a code known as the 'transaction advice addendum record' ('TAA') indicates that a charge is not for an airline ticket; (2) Amex's systems will not charge a premium for charges of less than $75; and (3) Amex's systems will automatically refund premiums when the TAA for a credit indicates that the credit is for an airline ticket refund. . . ."

The stipulation of settlement provided that if the court did not approve the settlement or it otherwise failed to become effective, "the Settling Parties shall be restored to their respective positions in the Litigation as of March 1, 2003." As to arbitration, the stipulation specifically provided: "Neither the Stipulation nor the settlement, including the agreement by American Express to stipulate to the certification of a nationwide settlement class, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the settlement: . . . (iii) is or may be deemed to be a waiver of American Express's right to seek to enforce its arbitration provision in other cases or against persons or entities who opt out of the settlement." A final approval hearing was scheduled for January 27, 2004.

A month before the preliminary approval, on July 10, 2003, ADI and other plaintiffs (jointly, ADI) filed a similar nationwide class action in the United States District Court for the Eastern District of New York. The factual allegations in the New York suit are virtually identical to this one, with the addition of a racketeering claim (18 U.S.C. § 1961(1)) (Racketeer Influenced and Corrupt Organizations Act) against Amex. Amex told the district court in New York that it intended to move to compel arbitration and that the preliminary approval order in the California action enjoined ADI from prosecuting the New York lawsuit.

ADI, along with various others, filed objections to the settlement in the California action and moved successfully to intervene. The objectors expressed concerns including that this was a "no dollar" settlement "and that there has been no meaningful effort to quantify the monetary losses to the class"; that certifying a nationwide class for nonmonetary settlement was "merely for the benefit of Amex in cutting off monetary claims and the potential for fluid recovery" and would implicate due process concerns given the lack of discovery concerning monetary damages; and that the named plaintiffs did not adequately represent the class.

On January 20, 2004, Amex filed a memorandum in support of final approval of the settlement. In its memorandum, Amex described the case as having been "vigorously litigated." It stated that "[a]s consideration for this settlement . . . American Express has agreed to: (1) *make extensive modifications* to its data processing systems related to the assessment and refunds of

Insurance Program premiums; . . . [¶] The *proposed modifications* to American Express's computer systems are extensive and of significant benefit to class members. First, American Express *will begin using a second code, known as the 'TAA,'* to determine whether a premium should be charged. The TAA had been used only for purposes of adding detail regarding the airline charge to a cardmember's billing statement. . . . *Under the new programming,* rather than the burden resting on the cardmember to seek a refund if the charge was not for an airline ticket, the system will not charge a premium even if one should be charged." (Italics added.)

Butler filed a declaration in support of preliminary approval that referred repeatedly to the addition of the TAA code as a system change or proposed modification. Butler's words were that as part of the proposed settlement "American Express will begin using a second code, known as the 'TAA,' to determine whether a premium should be charged"; and "will program its systems to issue automatic premium credits when airlines submit credits with TAA code . . . . This change will eliminate the need for cardmembers to request refunds when airlines submit sufficient information to enable American Express to determine that a premium should be refunded."

Pearson also offered a declaration in support of final approval. He stated: "Negotiation of the formal settlement agreement and related exhibits such as the class notice took several months, largely due to the technical nature of part of the settlement consideration and plaintiffs' counsel's insistence upon conducting substantial due diligence to confirm that the agreement adequately required AMEX to modify its data processing systems in the manner it had promised in the settlement negotiations." Regarding the lack of monetary relief to the plaintiff class, Pearson said that although plaintiffs' counsel had spent considerable time and effort to ascertain the improper charges imposed on class members, such information was simply not available absent a prohibitively cumbersome and expensive manual review of all customer billing statements for the relevant period. Pearson later testified that during this period he was under the impression his actions were consistent with his instructions from Alderoty and Strickland.

At the January 27, 2004, hearing, the court deferred approval of the settlement and allowed discovery "on all aspects of the proposed settlement and objections thereto." What that discovery revealed is critical to the issues in this appeal: Amex had in fact implemented the TAA code in November 2002. David Minerd, a lead programmer analyst for Amex, managed the implementation of the TAA code in Amex's flight delay, "hospital cash" and, later, baggage and flight insurance programs. He testified the TAA code had been incorporated in the flight and baggage insurance computer system since 2002 in the same form as the code Amex proposed to prospectively implement as consideration for the settlement. According to Minerd's testimony,

Amex's representations that the proposed class settlement involved a code *change* were false. He testified: "[Q]: Let me read you a few sentences from a declaration filed by your colleague, Mr. Butler, in connection with a hearing that was held before the court on January 27, 2004 from paragraph 8. [¶] 'As part of the proposed settlement'—and that's referring to the settlement of Hoffman versus American Express—'American Express will begin using a second code known as the TAA to determine whether a premium should be charged. The TAA had been used only for purposes of adding detail regarding the airline charge to card member's billing statement.' [¶] . . . Now, as of January 2004, that statement was false; was it not? American Express had begun using the TAA code as to airline flight and baggage in November of 2002 and as to hospital cash and travel delay as to the year 2000; right? [¶] A: That's my understanding. [¶] Q: Okay. So Mr. Butler's statement in January 2004 that they would begin using a second code as part of the settlement, that's a false statement? [¶] . . . [¶] [A]: That's my understanding."

Butler admitted that the statements in his declaration were "not accurate," because when he described it as a prospective change, Amex was already using the TAA code. Amex concedes there is "no dispute" that the TAA code had been implemented before the settlement was reached.

On December 15, 2004, Amex informed the court that plaintiffs had withdrawn their support for the settlement, and therefore approval would be impossible. Amex filed a notice of termination of settlement. At a later case management conference, plaintiffs advised the court they were withdrawing support "because Counsel for the Class was allegedly misled by American Express in connection with the Settlement." The court agreed to "entertain motions relating to sanctions, the effect of disapproval of the Settlement, if disapproval occurs, and any other matters relating to the future conduct of this action," and authorized discovery related to potential sanctions.

Plaintiffs did move for sanctions and, after hearings, on April 28, 2005, the court issued an order addressing those motions. It found Pearson's representations at the August 7, 2003, preliminary approval hearing were "misleading with reference to the changes in the operation of the AMEX insurance program to be 'prospective.' " It similarly found language in the published class notice that Amex promised to "modify" its computer codes "suggests a prospective modification of AMEX's computer codes when in fact AMEX has implemented the code changes for AMEX's Travel Delay and Hospital Cash Insurance programs as early as the year 2000 and had implemented the code changes for its airflight and baggage programs in November of 2002. Although the earlier implementation of these programs was arguably beneficial to the class, it was misleading to characterize them as prospective in nature and part of the current consideration for the settlement."

The court observed that Amex's counsel continued to insist the concept of using the TAA codes to filter out inappropriate insurance charges was suggested by plaintiffs' experts, not Amex, long after he knew that Amex had been using TAA codes in the travel insurance programs since 2002.

The court also found Amex's sworn statements that it could not access sufficient data to calculate specific damage claims and thereby award monetary relief to the class were "inaccurate and untrue."

The court concluded that "it was not well served and fully informed by counsel in this case. The clear import of the representations of class counsel and defendant's counsel was that the sole benefit to the class was a material and significant prospective change in the technical and business practices of AMEX concerning its travel related insurance programs. The Court was comforted by the declarations of due diligence by plaintiffs' counsel and similar assurances of defense counsel that no monetary relief was attainable because the data necessary for such a determination was not available and could only be discerned by a laborious, manual search of individual customer billings during the period in question. The Court now has serious doubts about such representations. [¶] The Court finds Plaintiffs' counsel were misled by defense counsel as reflected in the foregoing findings. However, Plaintiffs' counsel also bears some responsibility in being complacent in its due diligence, particularly with reference to the searchability of AMEX's database insofar as determining the possibility of a claim for damages or restitution for the alleged over billing of insurance premiums by AMEX."

Despite its conclusions and reservations, the court denied plaintiffs' motions to preclude Amex from contesting liability, shift the burden of proof to Amex to show premium charges were proper, and bar Amex from objecting to certification of a nationwide class. However, it granted plaintiffs' motion to require Amex to send a curative notice correcting erroneous information in the class notice of settlement and accurately describing the current status of the case to all putative class members.

Plaintiffs filed the fourth amended complaint on July 18, 2005. The court set dates for defendants to file responsive pleadings and their anticipated motion to compel arbitration, and set a hearing on a motion for class certification for December 14, 2005.

Amex moved to compel arbitration as to ADI in August 2005. The court denied the motion, because Amex had waived arbitration by (1) invoking the litigation process to settle the claims of ADI as part of a nationwide class; and (2) failing to take affirmative steps to implement the arbitration process until August 2005. Amex appealed from this order.

On December 14, 2005, the trial court granted in part plaintiffs' motion to certify a nationwide litigation class of all present and former cardholders enrolled in its fee-based travel-related insurance plans from September 6, 1995, to the present. Specifically, the court certified a "California Class" of all persons who held American Express charge cards with billing addresses in California and purchased Amex's travel insurance plans, and a "49 State Class" of non-California cardholders to pursue New York contract and common law claims. It declined to certify a class to pursue claims on behalf of persons who held American Express *credit* cards, which, unlike charge cards, are said to be governed by Utah law.

Amex moved to compel arbitration as to members of the "49 State Class"[4] on February 2, 2006, and to exclude from the class all members subject to arbitration agreements with Amex. The court denied the motion on the ground that Amex had waived its right to compel arbitration. It noted that a party generally does not waive its right to arbitrate by invoking the judicial forum to pursue settlement. Amex's misrepresentations about the TAA code as part of the settlement process, however, gave rise to unique considerations. "[T]he Court is deeply troubled at the notion that a party could appear before the Court, seek and obtain Court approval for a class settlement, mislead the Court, send out a misleading class notice, and then, when the settlement fails, assert a contractual right to arbitration that would take the claims out of the judicial system and require each putative class member to arbitrate his or her own claims individually. The Court's unease is rooted in the maxim of California jurisprudence that 'No one can take advantage of his own wrong.' [Citation.] Both federal and New York courts also recognize this basic principle. *Diaz v. United States* (1911) 223 U.S. 442, 458 [56 L.Ed. 500, 32 S.Ct. 250] ('Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.'); *Riggs v. Palmer* (1889) 115 N.Y. 506, 511 [22 N.E. 188, 23 Abb. N. Cas. 452] ('No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.'). In this case, Amex made an effort to misuse the Court's authority to obtain a broad release of claims without fully disclosing what benefits the proposed settlement would confer on the absent class members. Order of April 28, 2005. Although [Amex] did not actually obtain a broad release of claims because the settlement fell apart, [Amex] tried to benefit from a Court supervised settlement and would have benefited had the settlement been finally approved. This fact . . . leads the Court to find that

---

[4] The arbitration clause in the card member agreement was not made applicable to California residents until approximately November 2003. Because this suit had already been filed, the arbitration clause is not binding on those California residents who already had an American Express card at the time of the change. (See *In re Currency Conversion Fee Antitrust Litigation* (S.D.N.Y. 2004) 224 F.R.D. 555, 569.)

[Amex] waived its right to seek arbitration when it sought to resolve the claims on a classwide basis. It would simply be unfair to permit [Amex] to engage the judicial process, mislead the absent class members and the Court, and then assert a right to arbitrate and opt into private dispute resolution."

The court further found a nexus between the failed settlement and the arbitration clause "because [Amex] intended to use the settlement to resolve tens of thousands of claims that it otherwise would have had to resolve in individual arbitrations." In light of its finding of waiver, the court commented on but did not decide remaining issues including the application of Code of Civil Procedure section 1281.2, subdivision (c)[5] and the enforceability of the arbitration agreement under New York law.

Amex appealed this order as well and we consolidated the two appeals for briefing, argument and decision.

## DISCUSSION

### I. *Choice of Law Issues*

██ As a general matter, "[t]he FAA[6] applies to arbitration clauses in contracts involving interstate commerce and 'was designed to "overrule the judiciary's long-standing refusal to enforce agreements to arbitrate," [citation], and to place such agreements " 'upon the same footing as other contracts.' " ' [Citation.] 'However, the FAA's purpose is not to provide special status for arbitration agreements, but only "to make arbitration agreements as enforceable as other contracts . . . ." ' " (*Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1117, fn. omitted [39 Cal.Rptr.3d 437], quoting *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 384 [25 Cal.Rptr.3d 540, 107 P.3d 217].)

Amex's card member agreement is indisputably a contract involving interstate commerce. Paragraph 20 specifies that: "This Arbitration Provision is made pursuant to a transaction involving interstate commerce, *and shall be governed by the Federal Arbitration Act*, 9 U.S.C. Sections 1–16, as it may be amended ('the FAA'). The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall honor claims of privilege recognized at law and, at the timely request of either party, shall provide a brief written explanation of the basis for the award."

---

[5] The order incorrectly cites the provision as Code of Civil Procedure section 1082, subdivision (c). Section 1281.2, subdivision (c) identifies circumstances under which a court may refuse to order arbitration despite the existence of an arbitration agreement.

[6] Federal Arbitration Act, title 9 United States Code section 1 et seq.

(Italics added.) This arbitration provision controls over paragraph 21, a general choice-of-law provision which states that the card member agreement "shall be governed by the laws of the State of New York."[7] (See, e.g., *Bank of Tokyo v. Kvaerner* (N.Y.App.Div. 1998) 243 A.D.2d 1 [671 N.Y.S.2d 905, 910] [specific contract provision controls over consistent general provision]; see also *Sovak v. Chugai Pharmaceutical Co.* (9th Cir. 2002) 280 F.3d 1266, 1270 [general choice-of-law clause within arbitration provision does not overcome presumption that the FAA supplies the rules for arbitration].)

Plaintiffs acknowledge the specific directive within paragraph 20, but maintain that the issue regarding waiver or abandonment of arbitration is governed by New York law because this action was filed in a state court, and section 2 of the FAA dictates that state contract law governs the validity, revocability and enforcement of arbitration agreements. (See *Perry v. Thomas* (1987) 482 U.S. 483, 492 [96 L.Ed.2d 426, 107 S.Ct. 2520].)[8] We disagree. The language of paragraph 20 is unambiguous: the parties specified that the arbitration provision is governed by the FAA. (See *Rodriguez v. American Technologies, Inc., supra*, 136 Cal.App.4th at pp. 1121–1122.) Under the FAA, waiver of the right to compel arbitration is not viewed as a question of substantive contract law. "[W]aiver of the right to compel arbitration is a rule for arbitration, such that the FAA controls. Rules for arbitration include principles that affect the 'allocation of power between alternative tribunals.' [Citation.] Waiver, in the arbitration context, involves the circumstances under which a party is foreclosed from electing an arbitration forum. Therefore, the question of whether a party has waived its right to compel arbitration directly concerns the allocation of power between courts and arbitrators. Cf. *Moses H. Cone [Hospital] v. Mercury Constr. Corp.*[ (1983)] 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 . . . (explaining that 'an allegation of waiver' must be resolved in light of the FAA's preference for arbitration)." (*Sovak v. Chugai Pharmaceutical Co., supra*, 280 F.3d at p. 1270, citing *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 60 [131 L.Ed.2d 76, 115 S.Ct. 1212].) Therefore, "it is federal law, not state, that governs the inquiry into whether a party has waived its right to arbitration." (*Danny's Const. Co., Inc. v. Birdair, Inc.* (W.D.N.Y. 2000) 136 F.Supp.2d 134, 142; see also *Graphic Scanning Corp. v. Yampol* (2d Cir.

---

[7] The FAA allows contracting parties to agree to the rules under which the arbitration will be conducted. (*Cronus Investments, Inc. v. Concierge Services, supra*, 35 Cal.4th at p. 385; *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 479 [103 L.Ed.2d 488, 109 S.Ct. 1248].)

[8] In contrast, under the FAA "courts may not invalidate arbitration agreements under state law contract principles applicable *only* to arbitration provisions, and that therefore disfavor such contracts, or single them out for 'suspect status.' " (*Cronus Investments, Inc. v. Concierge Services, supra*, 35 Cal.4th at p. 385.) "Only 'generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2' of the FAA." (*Ibid.*)

1988) 850 F.2d 131; *Singer v. Jefferies & Co.* (1991) 78 N.Y.2d 76, 84–85 [571 N.Y.S.2d 680, 575 N.E.2d 98].) On this point *Singer,* a New York case, opines that "it appears that Federal law is controlling" (*Singer,* 575 N.Ed.2d at p. 102).[9] We agree.

The parties also disagree on the standard of review. Amex maintains the contractual choice of federal law requires us to apply the federal standard, and show deference to any express or implied factual findings but apply a de novo standard to the "ultimate question of whether, on those facts, a party has waived its right to arbitrate." (See, e.g., *In re Tyco Intern. Ltd. Securities* (1st Cir. 2005) 422 F.3d 41, 44; *Subway Equipment Leasing Corp. v. Forte* (5th Cir. 1999) 169 F.3d 324, 326 [waiver issue reviewed de novo, but underlying factual findings reviewed for clear error].) Citing *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 983 [64 Cal.Rptr.2d 843, 938 P.2d 903], plaintiffs assert that under California law, waiver is a strictly factual determination reviewed for sufficient evidence. We do not perceive the state and federal standards to materially differ for our purposes. Post-*Engalla,* our Supreme Court has clarified that in California, "Generally, the determination of waiver is a question of fact, and the trial court's finding, if supported by sufficient evidence, is binding on the appellate court. [Citations.] *'When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling.'* " (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 [8 Cal.Rptr.3d 517, 82 P.3d 727], italics added; see also *Rodriguez v. American Technologies, Inc., supra,* 136 Cal.App.4th at pp. 1116–1117 [where issue was strictly legal, court reviewed order denying arbitration de novo].) Under either the federal or state standard, therefore, we defer to the trial court's factual findings but independently review issues of law.

---

[9] Plaintiffs point to a number of cases that cite New York State decisions, rather than federal law, for waiver standards. (See, e.g., *Zack Associates, Inc. v. Setauket Fire District* (N.Y.App.Div. 2004) 12 A.D.3d 439 [783 N.Y.S.2d 827]; *Grenadeir Parking Corp. v. Landmark Associates* (N.Y.App.Div. 2002) 294 A.D.2d 313 [743 N.Y.S.2d 95]; *Johanson Resources, Inc. v. La Vallee* (N.Y.App.Div. 2000) 271 A.D.2d 832 [706 N.Y.S.2d 266, 269]; *Worcester Insurance Company v. Sauro* (N.Y.App.Div. 1998) 251 A.D.2d 509 [673 N.Y.S.2d 590].) None of these cases directly addresses whether federal law supplants state decisional authority on the issue of waiver of arbitration. Accordingly, we do not view them as authority on this point.

## II. *Waiver*[10]

■ The trial court cited *Creative Telecommunications, Inc. v. Breeden* (D. Hawaii 1999) 120 F.Supp.2d 1225, 1231–1233), for the federal rule governing whether the right to arbitrate is lost by participating in litigation: "To prove that a waiver of arbitration exists, a party must demonstrate '(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts.' [Citation.] The party arguing waiver 'bears a heavy burden of proof.' [Citation.] Any doubts as to waiver are resolved in favor of arbitration. [Citations.] [¶] The Ninth Circuit has determined that waivers of contractual rights to arbitration 'are not favored.' [Citation.] Thus, to waive arbitration rights, a party must 'substantially invok[e] the litigation machinery' in such a way as to prejudice the other party. [Citations.] If there is any ambiguity as to the scope of the waiver, the court must resolve the issue in favor of arbitration." (*Id.* at p. 1232.) The California rule on such a litigation waiver is in accord. (*St. Agnes Medical Center v. PacifiCare of California, supra*, 31 Cal.4th at p. 1195.) But as the United States Supreme Court has made clear, "the 'strong federal policy in favor of enforcing arbitration agreements' is based upon the enforcement of contract, rather than a preference for arbitration as an alternative dispute resolution mechanism. [Citation.] Thus, the question of whether there has been waiver in the arbitration agreement context should be analyzed in much the same way as in any other contractual context. The essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right." (*Nat. Foun. for Cancer Res. v. A.G. Edwards & Sons* (D.C. Cir. 1987) 261 U.S. App.D.C. 284 [821 F.2d 772, 774], citing *Dean Witter Reynolds Inc. v. Byrd* (1985) 470 U.S. 213, 218–224 [84 L.Ed.2d 158, 105 S.Ct. 1238].)

■ "Although the waiver determination 'necessarily depends upon the facts of the particular case and is not susceptible to bright line rules,' [citation], courts usually consider the amount of litigation, the time elapsed from the commencement of litigation to the request for arbitration, and the proximity of a trial date when arbitration is sought. [Citation.] 'Whether the party filing the lawsuit intended to elect a judicial forum rather than the arbitral tribunal' is an additional factor. [Citation.] . . . . [¶] 'Also relevant to the waiver inquiry is the degree to which the party seeking to compel

---

[10] We use the term "waiver" because that is the descriptor of the consequences of a party's participation in litigation that results in the loss of the right to arbitrate under federal law. But the principle is one of "default" under the FAA. (9 U.S.C. § 3.) Since waiver generally refers to the intentional relinquishment of a right (*Johnson v. Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 58 S.Ct. 1019]), we will discuss the consequence of Amex's conduct interchangeably as either waiver, or loss or abandonment of the right to arbitrate. (See *Engalla v. Permanente Medical Group, supra*, 15 Cal.4th at p. 983.)

arbitration has contested the merits of its opponent's claims; whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; the extent of its non-merits motion practice; its assent to the district court's pretrial orders; and the extent to which both parties have engaged in discovery.' " (*Creative Telecommunications, Inc. v. Breeden, supra,* 120 F.Supp.2d at p. 1233, boldface omitted; see also *Creative Solutions Group, Inc. v. Pentzer Corp.* (1st Cir. 2001) 252 F.3d 28, 32 [relevant factors include whether the other party was affected, misled, or prejudiced by the delay].) California courts, applying the FAA, also make clear that the " 'bad faith' " or " 'wilful misconduct' " of a party may constitute a waiver. (*St. Agnes Medical Center v. PacifiCare of California, supra,* 31 Cal.4th at p. 1196.)

Although prejudice is generally relevant, the federal circuits differ on the nature and degree of prejudice necessary to find waiver (see *Cabinetree of Wis. v. Kraftmaid Cabinetry, Inc.* (7th Cir. 1995) 50 F.3d 388, 390; *Rich v. Walsh* (S.C.Ct.App. 2003) 357 S.C. 64 [590 S.E.2d 506]), and at least one circuit has expressly rejected the notion that prejudice is a separate and independent element of the showing necessary to demonstrate waiver of the right to arbitrate. (*Nat. Foun. for Cancer Res. v. A.G. Edwards & Sons, supra,* 821 F.2d at p. 777.) To the extent a showing of prejudice is required, it may come in different guises. "This Court has recognized two types of prejudice: substantive prejudice and prejudice due to excessive cost and time delay. 'Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense.' [Citation.]" (*Thyssen, Inc. v. Calypso Shipping Corp., S.A.* (2d Cir. 2002) 310 F.3d 102, 105.)

Preliminarily, Amex's statement that the trial court "failed to cite the case law under the FAA which limits the acts that can be found to have waived the right to arbitrate" is refuted by the record. To the contrary, the trial court expressly observed that federal law does not favor waiver in this context; that plaintiffs attempting to show waiver of the right to arbitrate bear a "heavy burden of proof," and that any doubts are resolved in favor of arbitration. The trial court was well aware of the strong federal policy favoring enforcement of arbitration agreements and the concomitant limitations on waiver when it decided Amex's motion to compel arbitration. (See *Moses H. Cone Hospital v. Mercury Constr. Corp., supra,* 460 U.S. at p. 24.)

### III. *Analysis*

Since the court's rationale supporting denial of the motion to compel the class claims applies equally to the ruling on Amex's motion to compel as to

ADI, we will frame our discussion in the context of the class claims and will later discuss the motion directed to ADI. The trial court rejected plaintiffs' claims that Amex acted inconsistently with its right to arbitrate or "substantially invoked the litigation machinery" by defending against the claims brought by Hoffman on behalf of the general public, because Amex could not have compelled either Hoffman (a California resident not a party to the arbitration clause) or the general public to arbitrate. It also declined to find that Amex waived arbitration by pursuing a judicially supervised class settlement. Observing that court involvement is necessary to settlement of class claims and citing federal case law that suggests settlement efforts generally are not interpreted as waiving the right to arbitrate, the court concluded that Amex's settlement efforts, without more, did not constitute a waiver.

But Amex did more than merely defend Hoffman's claims and attempt to settle this case. The court went on to make two critical findings: Amex misled the court and class members about the proposed settlement, and the class members were prejudiced by Amex's conduct. Faced with the unusual facts of this case and little guidance in existing case law, the court referred to the general maxim that the law will not allow a person to take advantage of his own wrong. The court concluded Amex waived its right to arbitrate when it attempted to obtain a broad release of class claims by misleading the class members and the court about the benefits of the proposed settlement.

■ The court's factual finding that Amex misrepresented the principal benefits of the settlement to both the class members and the court are well supported in the record and, indeed, Amex does not dispute them. We discussed much of the relevant evidence in the Background part of this opinion, and need not belabor it here. The question for us is whether, in the eyes of the law, Amex's misuse of the settlement process is a circumstance that may deny it the right to arbitrate. Amex cites numerous cases holding that settlement attempts do not preclude the right to arbitrate if settlement fails. (See, e.g., *Carbajal v. H & R Block Tax Services, Inc.* (7th Cir. 2004) 372 F.3d 903, 905; *Dickinson v. Heinold Securities, Inc.* (1981) 661 F.2d 638, 641; *Walker v. J.C. Bradford & Co.* (5th Cir. 1991) 938 F.2d 575, 578]; see also *Lawrence v. Household Bank (SB), N.A.* (M.D.Ala. 2004) 343 F.Supp.2d 1101, 1113 [settlement of one case does not waive right to compel arbitration in another].) We have no reservations about this line of authority. Such holdings are premised on the strong public policy favoring settlement. "Offers to settle, like arbitration, are to be favored, as they encourage the amicable and quick settlement of suits outside the judicial system." (*Walker v. J.C. Bradford & Co., supra*, 938 F.2d at p. 578; see *Lawrence v. Household Bank (S.B.), N.A., supra*, 343 F.Supp.2d at p. 1113.)

But competing here against the public policy favoring settlement is the equally important value that settlement—and most certainly one that may affect thousands, perhaps millions of absent class members—should not be achieved through deceit upon the court and parties. Public policy concerns support the rule that parties must indeed be free to attempt to settle their disputes without losing their arbitration right if settlement fails. We perceive, however, no policy justification to extend this principle to encompass attempts to secure judicial imprimatur and finality on settlements obtained through misleading or deceptive tactics. We will not take such a remarkable step.[11]

■ Since Amex's actions are not exempt from a waiver analysis because they were merely settlement efforts, we will address the elements of waiver as applied in this context. As a general matter, if a contract provision is subject to arbitration and a party seeks a judicial resolution of a disagreement which falls within the scope of the arbitration agreement, that party waives its right to arbitration. (*St. Mary's Medical Ctr. v. Disco Alum. Products* (7th Cir. 1992) 969 F.2d 585, 589.) In pursuit of settlement, Amex indisputably made use of the judicial process. It successfully sought to expand the class to obtain a nationwide release of claims, obtained a stay of any court actions by class members pending settlement, and engaged in court hearings and considerable discovery pursuing court approval of the proposed agreement. Amex itself characterized this case as involving "more than two years of intense litigation." We agree with the trial court's conclusion that Amex's actions constituted an attempt at "judicial resolution" that was incompatible with its right to arbitrate.[12]

Even though a party's bad faith or willful misconduct may justify a refusal to compel arbitration (*St. Agnes Medical Center v. PacifiCare of California, supra*, 31 Cal.4th at p. 1196), we will address whether Amex's conduct prejudiced plaintiffs. When it declined to compel ADI to arbitrate, the court found that "American Express's delay in pursuing arbitration has affected, misled, or prejudiced Aviation Data because Aviation Data has gone from a litigation track in New York to an objector track in California to a litigation track in California and would be required to move again to an arbitration track. *The record also includes other evidence that Aviation Data has suffered*

---

[11] Based on its premise that settlement efforts are exempt from waiver analysis, Amex says it necessarily follows that "the statements of counsel *in connection with the settlement process* are not 'acts inconsistent with' " the right to compel arbitration. The record here indicates that Amex's deception about the TAA code was not restricted solely to its counsel. In any event, this syllogism fails with its equation of settlement efforts in general with settlement efforts that rely on misleading representations about the relief offered.

[12] Because we agree with the trial court's analysis regarding Amex's misleading conduct in pursuing settlement, we will not address the parties' dispute over whether Amex obtained discovery it could not have obtained in arbitration.

*prejudice.*" It also found Amex "prejudiced the absent class members when it misled them in its efforts to use the judicial process to resolve thousands of potential individual claims in a class settlement," that the court's order preliminarily approving the settlement prejudiced class members by prohibiting them from initiating claims in arbitration or in any other court, and that "the legal prejudice is not ameliorated because the absent class members could have telephoned [Amex] and Amex might have agreed to return the overcharges that are the subject matter of this litigation."

We have no reason to question these findings. By soliciting amendment of the complaint to allege a nationwide class and then crafting a proposed settlement structured around largely illusory relief, Amex forced ADI to intervene in the California action and required ADI and plaintiff class to engage in protracted and costly discovery and appearances before the court as its deception about the implementation of the TAA code gradually surfaced. Only after the truth was unearthed and the settlement failed did Amex move to compel arbitration. Amex's conduct smacks both of "substantive" prejudice " 'such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration' "; and of the situation in which a party " 'too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense.' " (*Thyssen, Inc. v. Calypso Shipping Corp., S.A., supra,* 310 F.3d at p. 105.)

While conceding that it "does not challenge" the court's factual rulings, Amex protests that the result here is too harsh because "the court made no finding of fraud or intent to mislead" and Amex was distant from the deceptive settlement tactics of its former trial counsel. The proof is in the pudding. The court explicitly noted its discomfiture with Amex's conduct: "The Court is deeply troubled at the notion that a *party* could appear before the Court, seek and obtain Court approval for a class settlement, mislead the Court, send out a misleading class notice, and then, when the settlement fails, assert a contractual right to arbitration that would take the claims out of the judicial system and require each putative class member to arbitrate his or her own claims individually." (Italics added.) The court specifically found that "*Amex* made an effort to misuse the Court's authority"; that "*AmEx* tried to benefit from a Court supervised settlement" and that it would "simply be unfair to permit *AmEx* to engage the judicial process, mislead the absent class members and the Court . . . ." (Italics added.) Manifestly, the trial court did not restrict its findings to Amex's defense counsel. Amex's further claim that there was no finding of deceptive *intent* fails to persuade in light of the court's plain statement that Amex "*made an effort to* misuse the Court's authority" and "*tried to* benefit" from the settlement.

We also find unpersuasive Amex's position that its (or, as it insists, Pearson's) misrepresentations cannot constitute waiver because "only prior litigation of the legal and factual *merits* of the controversy waives the client's right to compel arbitration of that controversy." The cases it cites are inapposite, as they stand merely for the proposition that litigation of certain specific claims does not waive a party's right to arbitrate other, legally and factually distinct claims. (See *Doctor's Associates, Inc. v. Distajo* (2d Cir. 1997) 107 F.3d 126, 133 [eviction actions did not waive right to arbitrate franchise disputes]; *Subway Equipment Leasing Corp. v. Forte, supra,* 169 F.3d at p. 328; *Microstrategy, Inc. v. Lauricia* (4th Cir. 2001) 268 F.3d 244, 250 [litigation of trade secret claims did not waive right to arbitrate unrelated discrimination claims].) The cases cited by Amex do not address circumstances under which using the judicial process to obtain a favorable settlement may, or may not, constitute a waiver of the right to arbitrate the exact claims sought to be settled. Certainly they do not hold that engaging in discovery and proceedings concerning a settlement offer rather than the merits of the litigation can never amount to a waiver of arbitration.

■ Finally, Amex maintains the denial of the motion to compel arbitration was an improper "additional sanction" for its misleading conduct because the court had previously required Amex to give new notice to the class, at a substantial cost. In support it cites two cases standing for the rule that a court may not impose sanctions under Code of Civil Procedure section 128.5 on the sole basis of conduct for which a party has already been sanctioned. (See *Sabado v. Moraga* (1987) 189 Cal.App.3d 1, 10–11 [234 Cal.Rptr. 249]; *Andrus v. Estrada* (1995) 39 Cal.App.4th 1030, 1042–1043 [46 Cal.Rptr.2d 300].) These cases are inapposite, as a finding that a party has implicitly waived or abandoned a contractual right is not a sanction but a legal consequence of acts inconsistent with the party's contractual rights. In the absence of authority for the proposition that the trial court could not require Amex to both correct its misleading class notice and construe its misleading conduct as a waiver of arbitration, we find its argument unpersuasive.

■ In summary, the court's denial of the motions to compel arbitration is supported by the record and consistent with the law. The dearth of cases construing such deceptive settlement tactics as a waiver or abandonment of the right to arbitrate is, we hope, a testament to the rarity of such behavior. It is not, however, a signal that in addressing these unusual circumstances the court did anything other than apply the pertinent legal principles to the circumstances before it in a manner consistent with sound public policy and well-settled equitable principles. We find no error.[13]

---

[13] We therefore do not reach the alternative grounds for affirmance suggested by plaintiffs.

## DISPOSITION

The orders are affirmed.

McGuiness, P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied July 27, 2007, and appellants' petition for review by the Supreme Court was denied October 31, 2007, S155439. George, C. J., and Kennard, J., did not participate therein.