Filed 4/12/16  Segal v. Shovlin CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| FRANKLIN J. SEGAL, | |
| Plaintiff and Appellant, | E062581 |
| v. | (Super.Ct.No. INC1103936) |
| MICHAEL J. SHOVLIN, Individually and as Co-Trustee, etc., | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  John G. Evans, Judge. Affirmed.

Law Offices of Gerald Philip Peters and Gerald P. Peters for Plaintiff and Appellant.

Law Offices of Michael Zitomer, Michael Zitomer, and Christopher R. Green; Law Offices of Rodney Lee Soda and Rodney Lee Soda for Defendant and Respondent.

Plaintiff Franklin J. Segal lent $1.6 million to defendant Michael J. Shovlin. Shovlin repaid only $600,000 of the principal, leaving $1 million due and owing.

1

The loan was supposedly secured by Shovlin's written pledge of his ownership interest in a limited liability corporation. However, under the corporation's governing documents, he could not transfer his interest without the consent of the other owner of the corporation. It is undisputed that, as a result, the pledge was unenforceable.

In this action, the trial court granted summary adjudication in favor of Segal on his contract claim for the $1 million. However, the jury found against Segal on his claim for additional damages on a theory of promissory fraud. Specifically, it found that Shovlin did make a false promise without the intention to perform, but it further found that Segal did not reasonably rely on the false promise.

Segal appeals, arguing that the jury's finding that he did not reasonably rely was not supported by substantial evidence. He also argues that the trial court erred by denying his motion for attorney fees. Finding no error, we will affirm.

I

FACTUAL BACKGROUND

Segal is a retired dentist and anesthesiologist. At one time, as a sideline, he also bought residential properties, rehabilitated them, and then rented them out. In late 2006, a long-time friend of both Segal and Shovlin put them in touch with each other.

Shovlin was seeking a loan for $1.6 million. According to Segal, Shovlin said that he wanted the money to buy a majority interest in an entity called Washington Plaza Associates, LLC (Washington). Shovlin explained that he already owned 50 percent of Washington; one John Curci owned the other 50 percent. Washington, in turn, owned a

2

shopping center in La Quinta. Curci had just died; as a result, Shovlin had a "window of opportunity" in which he could buy half of Curci's interest, which would give him 75 percent of Washington; otherwise, Curci's entire interest would go to Curci's family. Shovlin added that he had always been in charge of managing Washington, and he had total control of it.

Shovlin, however, denied saying that he wanted the loan so he could buy Curci's interest in Washington. Moreover, he testified, he never told Segal what he wanted the money for. Actually, he wanted it to pay off other loans.

Segal demanded security for the loan. Shovlin suggested using half of his 50 percent of Washington as security. A 25 percent interest in the shopping center was worth considerably more than the loan amount. Shovlin assured Segal that the security interest would be enforceable.

During the negotiations, Shovlin gave Segal Washington's operating agreement (Operating Agreement).[1] Segal read the entire Operating Agreement.

The Operating Agreement provided that Shovlin and the Curci-Turner Company had "joint control . . . of the company . . . ." Segal was concerned, because this was inconsistent with what Shovlin had told him.

The Operating Agreement also stated, "A member's interest in the company shall not be transferred . . . without the prior written consent of a majority of membership

---

[1] The Operating Agreement was admitted as an exhibit, but the parties have not included it in the joint appendix nor had the original transmitted to this court.

interests of the other members." This made Segal "question" whether Shovlin "could do what he said he could do in transferring the shares."

According to Segal, Shovlin assured him that, because he was using the loan to acquire a majority interest in Washington, the consent provision would not be a problem and the security interest would be enforceable.

Shovlin testified, however, that he never talked to Segal about the terms of the Operating Agreement.

Shovlin had attorney Joseph Roman prepare the loan documents. Roman drafted three separate documents.

First, there was a "Promissory Note Secured by Pledge Agreement" (Note). The Note, as ultimately executed, provided that Shovlin would make monthly interest payments of $13,333 (i.e., 10 percent per year) and would repay the principal amount of $1.6 million on July 1, 2009. The Note included an attorney fee provision.

Second, there was a pledge agreement (Pledge Agreement). The Pledge Agreement, as ultimately executed, granted Segal a security interest in 50 percent of Shovlin's interest in Washington as security for the Note. It also included an attorney fee provision.

Third, there was an assignment (Assignment). The Assignment, as ultimately executed, provided that Shovlin assigned to Segal 50 percent of his interest in Washington. The Assignment was given to Roman, who was to act as escrow holder.

Segal had his attorney, Gerald Smith, review the loan documents. However, he did not have Smith review the Operating Agreement. He claimed that Roman told him it was not necessary. Roman denied this. He testified that he was not aware of the Operating Agreement.

To fund the loan, Segal refinanced three rental properties that he owned. As a result, he incurred costs of $42,824.66.

On or about June 7, 2007, Segal and Shovlin executed the loan documents. Shovlin admitted knowing that the Pledge Agreement was unenforceable when he signed it.

On June 18, 2007, Segal wired the $1.6 million to Shovlin. Shovlin used most of the money to pay off other loans. He made timely interest payments. However, on July 1, 2009, when the principal was due, he paid only $200,000.

In September 2009, Segal and Shovlin entered into a modification agreement. It provided that Shovlin would pay $400,000 toward the principal and would bring the interest payments current. Thereafter, Shovlin did bring the interest payments current and did pay the $400,000. Thus, the unpaid principal balance was $1 million.

Later, Shovlin also started to make interest payments late. This was a problem for Segal, because he had to pay $12,700 a month on the properties that he had refinanced.

In April 2011, Segal demanded that Roman turn over the Assignment. Roman did not do so.

Segal testified that it was only after this action was filed that he first learned that Shovlin was contending that the security interest was not enforceable.

## II

## PROCEDURAL BACKGROUND

Prior to trial, the trial court granted summary adjudication on a cause of action for breach of contract in favor of Segal and against Shovlin.

When the case went to trial, the jury was instructed on only two causes of action: for a "false promise," and for "obtain[ing a] loan by false pretenses." By way of a special verdict, the jury unanimously found that: (1) Shovlin made a promise to Segal that was important to the transaction; (2) Shovlin intended Segal to rely on the promise; (3) when Shovlin made the promise, he did not intend to perform it; and (4) Segal did not reasonably rely on the promise. Accordingly, on October 8, 2014, the trial court entered judgment that Segal take nothing.[2]

Further facts relating to Segal's motion for attorney fees will be discussed in part IV, *post*.

---

[2]     Despite the summary adjudication in favor of Segal on his breach of contract cause of action, the judgment did not award him $1 million. Apparently this is because, in the meantime, Shovlin paid it.

6

## III

## THE JURY'S FINDING THAT SEGAL'S RELIANCE WAS NOT REASONABLE

Segal contends that the jury's finding that he did not reasonably rely on Shovlin's promise is not supported by substantial evidence.

"'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)

"[P]romissory fraud, like all forms of fraud, requires a showing of justifiable reliance on the defendant's misrepresentation. [Citation.]" (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183.) "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' [Citations.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)

Here, Segal's reliance was unreasonable because the Operating Agreement indicated that Shovlin could not transfer his interest in Washington without the consent of other owners. Segal admitted that he received and read the Operating Agreement. He

7

also admitted that he read the provision requiring consent to a transfer, and that it made him "question" whether Shovlin could use his interest as collateral.

Moreover, Segal had his own attorney, Gerald Smith, review the transaction. He gave Smith copies of the Note, the Pledge Agreement, and the Assignment. However, despite his own actual, subjective concerns about the effect of the Operating Agreement, he did not give Smith a copy of the Operating Agreement. He claimed that he did not do so because Roman told him it was unnecessary. However, the jury could find that, in light of Shovlin's admitted concerns, this was unreasonable. Also, Roman denied saying anything of the sort; the jury was entitled to believe Roman and to disbelieve Segal.

Segal claimed that Shovlin assuaged his concerns by claiming that he was using the proceeds of the loan to buy another 25 percent of Washington, which would give him a controlling interest of 75 percent; at that point, the provision requiring consent to a transfer would not be an impediment. Shovlin, however, denied saying anything of the kind. Again, the jury was entitled to believe Shovlin, not Segal.

Even more important, the precise wording of the consent provision, as it appears in the record, is that: "A member's interest in the company shall not be transferred . . . without the prior written consent *of a majority of membership interests of the other members*." (Italics added.) This meant that, even if Shovlin did acquire 75 percent of Washington, he still could not transfer his interest without the consent of a majority of the holders *of the other 25 percent*. Thus, Segal could not reasonably rely on Shovlin's supposed assurance.

Segal also points out that "'[n]egligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.' [Citation.]" (*Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th at pp. 1239-1240.)  However, Segal did not request a jury instruction to this effect.  The only relevant jury instruction was that Segal had to prove, among other things, "[t]hat Franklin J. Segal reasonably relied on Michael J. Shovlin's promise." "[W]here a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury." (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535.)  Absent an instruction further defining reasonableness, for the reasons already stated, the jury could find that Segal's reliance was unreasonable.

In any event, even if the jury had been given such an instruction, it could still find that Segal's reliance was unreasonable.  Even in an intentional fraud case, "a plaintiff's reliance is not reasonable when he ""'put[s] faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth . . . .' [Citation.]" [Citation.]' [Citation.]" (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1067.)  The jury could reasonably find that Segal's reliance was "manifestly unreasonable" so as to bar recovery for intentional fraud.  (See *Seeger v. Odell* (1941) 18 Cal.2d 409, 415.)

Segal also argues that the jury's finding is inconsistent with the trial court's order granting summary adjudication in his favor on his cause of action for breach of contract. He does not explain further. We see no inconsistency.

Next, Segal argues that it was not credible that he would make an unsecured $1.6 million loan to a stranger. The jury was not saying however, that he *knew* the loan was unsecured. Rather, it found that his belief that it was secured was *unreasonable*.

Finally, Segal argues that the Note, the Pledge Agreement, and the Assignment were an integrated agreement, and therefore "the trial court should not have allowed Shovlin to introduce any evidence to contradict the contract terms . . . ." Quite frankly, this argument makes no sense. As best we can tell, it rests on a number of unarticulated assumptions — assumptions that we do not accept. For one thing, like his previous argument, it seems to assume that the jury found that he *knew* the Pledge Agreement was unenforceable. Moreover, it seems to assume that he was seeking to enforce the Pledge Agreement, and Shovlin was trying to prove that it was not enforceable. But not so. Segal was claiming promissory fraud. Thus, both sides *agreed* that the Pledge Agreement was unenforceable; Segal was simply trying to prove that Shovlin misrepresented its enforceability by entering into it.

We therefore conclude that there was substantial evidence to support the finding that Segal's reliance was not reasonable.

IV

THE DENIAL OF SEGAL'S MOTION FOR ATTORNEY FEES

Segal contends the trial court erred by denying his motion for attorney fees. As a fallback argument, he also contends that it erred by denying his motion for reconsideration.

A.     *Additional Factual and Procedural Background*.

Segal's original complaint attached a copy of the Note. It was three pages long; the pages were numbered. The second page included an attorney fee clause.

The first and third amended complaints likewise attached a copy of the Note; however, they were missing the second page.

Segal's motion for summary judgment included the full three-page version of the Note. The full three-page version of the Note was also introduced as an exhibit at trial.

After entry of judgment, Segal filed a motion for attorney fees, seeking $337,692.50. The motion did not claim that there was an attorney fee provision in the Note; it relied exclusively on the attorney fee provision in the Pledge Agreement. It included, as exhibits, copies of the Note and the Pledge Agreement. Again, however, the Note was missing the second page.

The attorney who filed the motion was Emma D. Enriquez. She substituted in as counsel for Segal on the same day as she filed the motion. However, she had appeared as one of his attorneys of record earlier in the action, including on the third amended complaint, though not on the motion for summary adjudication nor at trial. The billing

11

records attached to the motion for attorney fees revealed that she had worked on the case for 263.9 hours before trial. Among other things, she took Shovlin's deposition and researched the availability of attorney fees in connection with a Code of Civil Procedure section 998 demand.

In opposition to the motion, Shovlin argued: "There is no attorney fee provision contained in the operative contract. Specifically, the . . . Note . . . does not contain an attorney fee provision. . . . [¶] Plaintiff attempts to establish a claim for attorney's fees based on a provision contained in an entirely different contract, the Pledge Agreement . . . ." He also argued that the attorney fee provision in the Pledge Agreement was unenforceable because the Pledge Agreement was "invalid and unenforceable."

The trial court denied the motion for attorney fees. It explained that Segal had prevailed on a cause of action to enforce the Note, but he had never sought to enforce the Pledge Agreement, and the Note did not include an attorney fee provision. It added that "[t]he . . . language in the Pledge [A]greement is not broad enough to include enforcement of the . . . [N]ote."

Segal filed a motion for reconsideration. In it, he pointed out for the first time that the Note did, in fact, include an attorney fee provision and argued that this was a new fact warranting reconsideration.

The trial court denied the motion for reconsideration. It explained that it found no relevant change of circumstances. When counsel for Segal asserted that there had been an "inadvertent[]" attorney error, it responded: "This is not a 473 motion. The Court

12

finds that you have not met the requirements of C.C.P. section 1008, and the motion is denied for that reason."

B.     *The Motion for Attorney Fees.*

As the party seeking attorney fees, Segal had the burden of proof. (Evid. Code, § 500; see *Corbett v. Hayward Dodge, Inc.* (2004) 119 Cal.App.4th 915, 926.) He failed to introduce the second page of the Note. As a result, there was no evidence that he was contractually entitled to attorney fees. Accordingly, the trial court properly denied the motion.

Segal points out that correct copies of the Note were elsewhere in the record; for example, one was introduced at trial. However, the trial court was not required to consider them because they were not filed with the motion. The party bringing a motion must serve and file "all moving and supporting papers." (Code Civ. Proc., § 1005, subd. (b).) This means that "[t]he original or copies of all evidence that will be presented to the court at the motion hearing must be served along with the notice of motion and points and authorities." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 9:44.) "Any paper previously filed must be referred to by date of execution and title." (Cal. Rules of Court, rule 3.1110(d).) Arguably, there may be instances in which the trial court is *allowed* to consider other evidence of which it happens to be aware, but it is never *required* do so.

Moreover, Segal's moving papers included an incorrect copy of the note, along with a declaration under penalty of perjury asserting that it was "true and correct." Thus,

even assuming the trial court erred by failing to consider other copies of the Note, the error was invited.  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 ["'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal.  [Citation.]"].)

Segal argues that the copy of the Note included in the motion was "obviously incomplete."  As his own attorney did not realize this, it ill becomes him to blame the trial court for not realizing it, either.  In any event, the mere fact that the second page of the Note was missing fell far short of meeting his burden of affirmatively proving that it *did* contain an attorney fee clause.

Next, Segal argues that, by stating falsely in opposition to the fee motion that there was no attorney fee provision in the Note, Shovlin's counsel should be deemed to have waived the right to oppose the motion.  Somewhat unhelpfully, Shovlin does not respond to this argument.

Segal relies on *Aviation Data, Inc. v. American Express Travel Related Services Co., Inc.* (2007) 152 Cal.App.4th 1522.  There, counsel for the defendant misrepresented the benefit to the plaintiffs of a proposed settlement; when the misrepresentation was revealed, the settlement fell apart, necessitating litigation.  (*Id.* at pp. 1526-1531.)  The court held that the misrepresentation constituted a waiver of the corporation's right to compel arbitration.  (*Id.* at pp. 1526, 1538-1542.)  The court noted, however, that the defendant itself was complicit in the misrepresentation by its counsel.  (*Id.* at p. 1541; see

14

also *id*. at pp. 1526-1528, 1530-1531.) It also noted that the defendant had made the misrepresentation intentionally. (*Id*. at p. 1541.)

Segal cites no authority for the proposition that an attorney can be sanctioned for an innocent or even a negligent misrepresentation to the court. A fortiori, he cites no authority for the proposition that an innocent client can be sanctioned for his or her attorney's misrepresentation. As an appellate court, faced with a record in which this issue was not raised below, we have no way of knowing whether the misrepresentation was intentional or innocent; likewise, we have no way of knowing whether Shovlin was or was not involved. Thus, Segal cannot show the denial of his fee motion was reversible error. (See *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 ["a party challenging a judgment has the burden of showing reversible error by an adequate record"].)

Finally, Segal argues that the trial court should have granted the motion based on the attorney fee provision in the Pledge Agreement, because the Note, the Pledge Agreement, and the Assignment collectively constituted a single integrated contract. Again, Shovlin does not respond to this argument.

Segal's argument depends on *Nevin v. Salk* (1975) 45 Cal.App.3d 331. There, Salk sold an animal hospital to Nevin. (*Id*. at pp. 334-335.) They used a number of documents to carry out the sale, including a purchase and sale agreement, a deed of trust, and two notes. The deed of trust and the notes included attorney fee provisions; the purchase and sale agreement did not. Nevin sued Salk for fraud. Salk prevailed and was awarded attorney fees. (*Id*. at p. 335.)

On appeal, Nevin argued that Salk was not entitled to attorney fees because there was no attorney fee provision in the purchase and sale agreement.  (*Nevin v. Salk*, *supra*, 45 Cal.App.3d at pp. 337-338.)  This court responded:  " . . . Nevin's contention ignores the fact that both notes were referred to in the agreement and that the trial court found that the notes and security agreements were incorporated in the agreement. . . . Moreover, the deed of trust provided for payment of fees if it was necessary to defend any lawsuit affecting the security or the rights of the beneficiary.

"Under section 1642 of the Civil Code, it is the general rule that several papers relating to the same subject matter and executed as parts of substantially one transaction, are to be construed together as one contract.  [Citation.]  Thus, a note, mortgage and agreement of sale constitute one contract where they are part of the same transaction.  [Citation.] . . .

"Inasmuch as the provisions of the notes and the security instruments were incorporated in the agreement, and made a part thereof, and inasmuch as the sale involved one piece of property and veterinary practice, the trial court properly concluded all the instruments formed a single contract and the fact the agreement itself contained no provision for payment of fees in the event of a lawsuit is of no consequence."  (*Nevin v. Salk*, *supra*, 45 Cal.App.3d at p. 338.)

We do agree that, in this case, the Note, the Pledge Agreement, and the Assignment were "parts of substantially one transaction" within the meaning of Civil Code section 1642.  However, the trial court did not rule otherwise.  Rather, it ruled that

16

Segal did not prevail on any cause of action that was *within the scope* of the attorney fee provision in the Pledge Agreement. Segal does not challenge this particular ruling; he does not explain why his claims *were* within the scope of the language of the attorney fee provision in the Pledge Agreement. We may reject his contention for this reason alone.

In any event, the trial court's reasoning was correct. The attorney fee provision in the Pledge Agreement provided: "Pledgor shall pay promptly all costs and expenses incurred by Pledgee in connection with the enforcement of rights by Pledgee under this Agreement, including, but not limited to, reasonable attorneys' fees . . . ." Although the Pledge Agreement does not expressly define "this Agreement," elsewhere, it also refers to "this Pledge Agreement." By contrast, when it refers to "the Note and this Pledge Agreement," it specifies each of them separately. Accordingly, the attorney fee provision in the Pledge Agreement gave Segal a right to attorney fees if — and only if — he prevailed on a cause of action based on the Pledge Agreement. But he prevailed solely on a cause of action based on the Note.

We know — though the trial court did not — that the Note had its own separate attorney fee provision. But this merely confirms that the parties did not intend the attorney fee in the Pledge Agreement to apply to a cause of action on the Note.

In *Nevin*, we did not quote any of the attorney fee provisions. However, we did paraphrase the attorney fee provision in the deed of trust, which stated that it applied in any lawsuit affecting the security or the rights of the beneficiary. (*Nevin v. Salk*, *supra*, 45 Cal.App.3d at p. 338.) Thus, Salk's defense of Nevin's fraud action against him was

17

within the scope of the relevant attorney fee provision. Here, however, Segal's cause of action on the Note was not within the scope of the attorney fee provision in the Pledge Agreement.

We therefore conclude that the trial court did not err by denying the motion for attorney fees.

C.      *The Motion for Reconsideration.*

A motion for reconsideration must be based "upon new or different facts, circumstances, or law . . . ." (Code Civ. Proc., § 1008, subds. (a), (b).) "[T]he party seeking reconsideration must provide not only new evidence but also a satisfactory explanation for the failure to produce that evidence at an earlier time. In short, the moving party's burden is the same as that of a party seeking new trial on the ground of 'newly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial.' [Citation.]" (*Blue Mountain Development Co. v. Carville* (1982) 132 Cal.App.3d 1005, 1013; see also *Baldwin v. Home Sav. of America* (1997) 59 Cal.App.4th 1192, 1198-1200 [1992 amendment to Code Civ. Proc., § 1008 did not eliminate diligence requirement].) These requirements are jurisdictional. (Code Civ. Proc., § 1008, subd. (e).)

"We review the trial court's ruling on the motion for reconsideration under the abuse of discretion standard. [Citation.]" (*In re Marriage of La Moure* (2013) 221 Cal.App.4th 1463, 1473.)

18

Attorney Enriquez testified that, when she prepared the motion for attorney fees, she relied on the copy of the Note that had been attached to the first and third amended complaints. She "did not notice" that they lacked the second page. The trial court could reasonably find that this fell short of demonstrating reasonable diligence.

Segal argues that the trial court should have treated the motion as if it were a motion for relief based on attorney mistake under Code of Civil Procedure section 473. Arguably, the trial court had *discretion* to treat the motion for reconsideration as some other kind of motion. (See *Passavanti v. Williams* (1990) 225 Cal.App.3d 1602, 1608.) However, Segal does not cite any authority for the proposition that it was *required* to do so. It was not. (See *id*. at p. 1609 [when trial court did not ignore "the label" of a motion, appellate court should not do so either].)

We therefore conclude that the trial court also properly denied the motion for reconsideration.

V

DISPOSITION

The judgment and the order denying the motion for attorney fees are affirmed. Shovlin is awarded costs on appeal against Segal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:
McKINSTER

J.

MILLER

J.

19