Filed 3/23/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WILSON FARRAR,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DIRECT COMMERCE, INC.,<br><br>　　　Defendant and Appellant. | A146944<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-15-546622) |

Plaintiff Wilson Farrar has sued her former employer, defendant Direct Commerce, Inc., alleging causes of action for breach of contract, conversion, wrongful termination, breach of the covenant of good faith and fair dealing, and failure to pay wages owed and waiting time penalties. Farrar, who was hired by the company as its vice president of business development, negotiated an employment agreement set forth in a six-page offer letter detailing, inter alia, her compensation, additional bonus structure, and stock options. The agreement also included an arbitration provision, set off by the same kind of underlined heading and spacing as the other enumerated paragraphs of the agreement. The trial court denied Direct Commerce's petition to compel arbitration on the ground of the arbitration provision was procedurally and substantively unconscionable. While the arbitration provision is one-sided, as it excludes any claims arising from the confidentiality agreement Farrar also signed, we conclude that offending exception is readily severable and, on this record, should have been severed. We therefore reverse and remand for arbitration.

**BACKGROUND**

In November 2010, Farrar and Direct Commerce's founder and president, Bruce Hanavan, began discussions about her joining the company as vice president of business

1

development.  Direct Commerce creates and markets software, allowing businesses to receive automated payment information, invoices and purchase orders from suppliers and purchasers, and sells its products throughout the United States.[1]

Farrar stated in her declaration opposing arbitration that, at the time, she was unemployed and had not been employed for a number of months (although in her two-page resume she represented she was working for her own company).  She had extensive work experience, however, having founded and sold two successful technology companies and worked in sales and/or business development for 22 years.  She had consulted at director-level positions for Hewlett Packard and Adobe, had founded a consulting company, and had been vice president of sales in a number of start-up companies.  She additionally held herself out as being experienced in negotiating contracts.

On December 1, 2010, Hanavan sent Farrar an e-mail entitled "First Stab at a Structure."  Hanavan sketched out a proposed base pay, commission structure for additional pay which included a percentage on implementation and monthly fees based on deals made by the sales team, and stock options based on "success criteria."  Additionally, Hanavan outlined Farrar's anticipated job responsibilities.  Hanavan sent another e-mail on December 17, entitled "Compensation" and discussing the goal of growing the company, Farrar's potential commission percentage, and timing of commission payouts.  Farrar, in turn, prepared a December 20, 2010, document titled "Discussion Purposes," outlining her job title, base salary, commission, stock options, expenses, computer needs, and benefits.  In short, Farrar negotiated over her job title and duties, compensation, bonuses and stock options.

On December 31, Hanavan sent Farrar, as an attachment to an e-mail, a six-page, offer letter setting forth the terms and conditions of her proposed employment.  Paragraph

---

[1]  Accordingly, it is undisputed this case is governed by the Federal Arbitration Act, title 9 United States Code section 1 et seq.  (See *Aviation Data, Inc. v. American Express Travel Related Services Co., Inc.* (2007) 152 Cal.App.4th 1522, 1534.)

13, entitled "Arbitration" and in the same font and graphic style as the other paragraphs, provided:

> "13.  Arbitration.  If any dispute arises relating to your employment or its termination, the dispute will be referred to and resolved by binding arbitration before a neutral arbitrator.  This means that there will be no trial before a judge or jury or hearing before any state or federal administrative body of any dispute relating to your employment by Direct Commerce or the termination of that employment.  The arbitration will be held in San Francisco, California and administered by the American Arbitration Association in accordance with that organization's rules.  The arbitrator will have authority to decide on an appropriate remedy, provided that the arbitrator may only grant a remedy which a court of law could award under similar circumstances.  The award of the arbitrator will be final and binding on all parties and may be enforced in any court having jurisdiction over the matter.  The types of claims that are subject to arbitration will include, but will not be limited to, claims of improper termination of employment, claims of unlawful discrimination and claims of sexual or other forms of harassment.  However, the following types of disputes will not be required to be submitted to arbitration:  (a) any claim for compensable injury under California's Worker's Compensation Law; or (b) any claim based on or related to the Confidentiality and Inventions Agreement between you and Direct Commerce."

In his e-mail, Hanavan told Farrar he would be "around all weekend" and he had a copy of the proposed offer letter if "you want to talk."  Farrar replied she would " 'read this carefully and respond very soon.' "  Thereafter, Farrar continued to negotiate about her economic package.

However, Farrar stated in her opposing declaration that, based on her December conversations with Hanovan, she "was led to believe that outside of the compensation portion of the offer letter," the remaining proposed terms of employment were "non-negotiable" and terms to which all employees had to agree.  Hanavan, in his reply declaration, did not dispute this.  In fact, in his initial declaration, he explained why the company "has its employees sign a separate Assignment of Inventions and Confidentiality Agreement" and why claims related to this agreement are excluded from the arbitration provision.

3

On January 5, 2011, Hanavan sent Farrar a revised offer letter. The final offer letter was also six pages in length and its enumerated paragraphs were also set off by underlined headings and separated from other paragraphs by double spacing. Paragraph 13 provided:

> "13. Arbitration. If any dispute arises relating to your employment or its termination, the dispute will be referred to and resolved by binding arbitration before a neutral arbitrator. This means that there will be no trial before a judge or jury or hearing before any state or federal administrative body of any dispute relating to your employment by Direct Commerce or the termination of that employment. The arbitration will be held in San Francisco, California and administered by ADR Services, Inc. in accordance with that organization's rules. The arbitrator will have authority to decide on an appropriate remedy, provided that the arbitrator may only grant a remedy which a court of law could award under similar circumstances. The award of the arbitrator will be final and binding on all parties and may be enforced in any court having jurisdiction over the matter. The types of claims that are subject to arbitration will include, but will not be limited to, breach of contract, claims of improper termination of employment, claims of unlawful discrimination and claims of sexual or other forms of harassment. However, the following types of disputes will not be required to be submitted to arbitration: (a) any claim for compensable injury under California's Worker's Compensation Law; or (b) any claim based on or related to the and Assignment of Inventions & Confidentiality Agreement between you and Direct Commerce."

Thus, this paragraph differed from the arbitration paragraph in the initial offer letter in three respects: First, the initial offer letter specified arbitration would be before the American Arbitration Association (AAA), while the final letter provided arbitration would be administered by ADR Services, Inc. (ADR). Second, the final offer letter added "breach of contract," to the "type of claims" subject to arbitration. Third, the provision of the final offer letter identifying claims excluded from arbitration referred to an "Assignment of Inventions & Confidentiality Agreement," rather than to what the initial offer letter had called a "Confidentiality and Inventions Agreement."

Both the initial offer letter and the final offer letter referred to confidentiality in two other paragraphs. Paragraph 8 of the initial offer letter, entitled "Confidential

4

Information," stated "Direct Commerce anticipates that it will develop key proprietary information crucial to its business" and provided Farrar would, as a condition of her employment, sign "a Confidentiality Agreement in the form delivered to you by Direct Commerce." The closing paragraph of the initial offer letter, before the signature block, also asked Farrar to "[p]lease also sign the Assignment of Inventions and Confidentiality Agreement enclosed with this letter and return it to us, together with the signed copy of this letter." Paragraph 8 of the final offer letter was likewise entitled "Confidential Information," and similarly stated, "Direct Commerce has developed and will continue to develop key proprietary information crucial to its business" and provided Farrar, as a condition of her employment, would "sign a Confidentiality Agreement in the form delivered to you by Direct Commerce." The closing paragraph of the final offer letter, before the signature block, again asked Farrar to "[p]lease also sign the Assignment of Inventions and Confidentiality Agreement enclosed with this letter and return it to us, together with the signed copy of this letter."

Although Farrar signed the final offer letter on January 6, 2011, she states in her opposing declaration that she did not actually receive the confidentiality agreement until four days later, on January 10, 2011, when she started her employment. Farrar makes no claim, however, that she objected to either the initial or final offer letter because the referenced confidentiality agreement was not attached. Nor does she claim that she ever asked for and was refused a copy of the confidentiality agreement.

In Hanavan's e-mail to Farrar attaching the final offer letter, he pointed out he had "added the section about evaluating commission for Ongoing Fees at the end of year 2." He made no mention of the changes to paragraph 13 or of any other wording changes in the final offer letter.

The final offer letter and agreement provided Farrar with a $100,000 salary, plus commissions and the opportunity for stock options. Direct Commerce was assisted by counsel during the negotiations with Farrar. Farrar was not represented, but makes no claim she asked for additional time or for the opportunity to review the offer letter with counsel and was refused.

5

Four years later, Direct Commerce terminated Farrar's employment, and in June 2015, she sued the company, alleging breach of contract, conversion, wrongful termination, breach of the covenant of good faith and fair dealing and failure to pay wages owed and waiting time penalties.

Direct Commerce moved to compel arbitration.

The trial court denied its petition, concluding the arbitration provision was both procedurally and substantively unconscionable. It ruled the provision was procedurally unconscionable because Farrar "had no meaningful choice whether or not to accept the arbitration agreement" and she was " 'surprised' (as that term is used in the arbitration agreement case law) by the change in providers, the absence of the rules attached, and the Confidentiality Agreement not given to her until after she signed the letter of agreement." It ruled the provision was substantively unconscionable because of the exclusion for trade secret claims.

## DISCUSSION

"Unconscionability ' " 'refers to " 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.' " ' (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243 . . . (*Baltazar*).)" (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 246 (*Nguyen*).)

"Both procedural and substantive unconscionability must be present for the court to refuse to enforce a contract under the doctrine of unconscionability although 'they need not be present in the same degree.' (*Baltazar*, *supra*, 62 Cal.4th at p. 1243.) Essentially, the court applies a sliding scale to the determination: ' "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." ' (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development*

6

*(US), LLC* (2012) 55 Cal.4th 223, 247 . . . (*Pinnacle*).)” (*Nguyen*, *supra*, 4 Cal.App.5th at p. 247.)

“ ‘The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement.’ (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 912 . . . ; see *Baltazar*, *supra*, 62 Cal.4th at p. 1245 [‘[c]ommerce depends on the enforceability, in most instances, of a duly executed written contract[;] [a] party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain’].)” (*Nguyen*, *supra*, 4 Cal.App.5th at p. 247.)

“The trial court’s unconscionability determination, absent conflicting extrinsic evidence, is a question of law subject to de novo review. (*Pinnacle*, *supra*, 55 Cal.4th at p. 236.) ‘ “However, where an unconscionability determination ‘is based upon the trial court’s resolution of conflicts in the evidence, or on the factual inferences which may be drawn therefrom, we consider the evidence in the light most favorable to the court’s determination and review those aspects of the determination for substantial evidence.’ ” ’ (*Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 820–821 . . . (*Lhotka*).)” (*Nguyen*, *supra*, 4 Cal.App.5th at p. 247.)

In this case, the facts are undisputed. Accordingly, whether the arbitration provision, set forth in paragraph 13, is procedurally and substantively unconscionable present legal questions we examine anew. “ ‘In keeping with California’s strong public policy in favor of arbitration, any doubts regarding the validity of an arbitration agreement are resolved in favor of arbitration.’ ” (*Nguyen*, *supra*, 4 Cal.App.5th at p. 247, quoting *Lhotka*, *supra*, 181 Cal.App.4th at p. 821.)

*Procedural Unconscionability*

“ ‘ “[T]here are degrees of procedural unconscionability. At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability . . . . Contracts of adhesion that involve surprise or other sharp practices lie on the other end of the spectrum. Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced,

7

contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching.'. . ." [Citation.] . . . [C]ourts must be "particularly attuned" to this danger in the employment setting, where "economic pressure exerted by employers on all but the most sought-after employees may be particularly acute." ' (*Baltazar*, *supra*, 62 Cal.App.4th at p. 1244.)" (*Nguyen*, *supra*, 4 Cal.App.5th at p. 246.)

This case differs from many employment cases where applicants for staff or lower level positions fill out a form employment application or are subsequently presented with a form employment agreement on a take-it-or-leave it basis. (Compare *Baltazar*, *supra*, 62 Cal.4th at pp. 1241–1242.) Here we are dealing with a negotiated employment agreement for a top level executive who had extensive experience in sales and business development and held herself out as being experienced in contract negotiations. Thus, the instant case falls closer to that end of the procedural unconscionablity spectrum where contracts " 'have been freely negotiated by roughly equal parties' " than it does to the other end of the spectrum, where a decidedly stronger party has employed " 'sharp practices' " and " 'surprised' " the weaker party, resulting in significant procedural unconscionability. (*Baltazar*, *supra*, 62 Cal.4th at p. 1244, quoting *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 (*Gentry*), abrogated in part by statute as stated in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 366.)

Farrar has averred, however, and Direct Commerce has not disputed, that while she was able to negotiate the economic terms of her employment, she believed she could not negotiate other terms, including the arbitration provision and the requirement that she sign a separate confidentiality agreement.

In *Armendariz*, the Supreme Court explained " '[t]he term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Armendariz v. Foundation Health Psychare Services, Inc.* (2000) 24 Cal.4th 83, 113, abrogated in part on another ground in *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 339–340, quoting *Neal v. State Farm Ins. Cos.* (1961)

8

188 Cal.App.2d 690, 694; see *Armendariz*, at p. 115 [the agreements were "imposed on employees as a condition of employment and there was no opportunity to negotiate"].)

*Armendariz* cited with approval to *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519 (*Stirlen*), in which the Court of Appeal "concluded that the [employment] agreement was one of adhesion, even though the employee in question was a high-level executive, because of the lack of opportunity to negotiate." (*Armendariz*, *supra*, 24 Cal.4th at p. 116.) In *Stirlen*, the plaintiff "appear[ed] to have had no realistic ability to modify the terms of the employment contract. Undisputed evidence show[ed] that the terms of the contract, which were cast in generic and gender-neutral language, were presented to him after he accepted employment and were described as standard provisions that were not negotiable." (*Stirlen*, at p. 1534.) The plaintiff in *Stirlen* did negotiate a side agreement covering stock options, bonus, and retirement plans and other " 'extras,' " but this was set forth in a separate letter agreement executed more than a month before he signed what the letter agreement referred to as the " 'standard employment contract.' " (*Ibid.*)

While the record in the instant case indicates Farrar had a greater opportunity to negotiate the terms and conditions of her employment than did the plaintiff in *Stirlen*, the fact remains she apparently had no opportunity to negotiate over the arbitration provision or the requirement that she sign a confidentiality agreement, and apparently all employees had to agree to these two conditions of employment. Accordingly, in these two respects, the agreement was "adhesive." (See *Sanchez*, *supra*, 61 Cal.4th at p. 915 [adhesive nature of contract "sufficient to establish some degree of procedural unconscionability"].)

We therefore turn to the question of the "degree" of procedural unconscionability afflicting the agreement, since that governs the degree of scrutiny that should be brought to bear in analyzing its substantive fairness. (See *Baltazar*, *supra*, 62 Cal.4th at pp. 1245–1246 [while the adhesive nature of an employment contract requires that a court "be 'particularly attuned' " to a claim of unconscionability, a court will not subject such a

9

contract "to the same degree of scrutiny as '[c]ontracts of adhesion that involve surprise or other sharp practices' "], quoting *Gentry*, *supra*, 42 Cal.4th at p. 469.)

*Baltazar*, which was decided after the trial court ruled in this case, provides instructive guidance on this issue. In *Baltazar*, the plaintiff claimed the fact AAA rules were not attached to the adhesive employment agreement heightened its procedural unconscionability, thus calling for "closer scrutiny" of the agreement's substantive fairness. (*Baltazar*, *supra*, 62 Cal.4th. at p. 1246.) The Supreme Court first observed there was no element of "surprise" because Baltazar knew about the arbitration provision; in fact, she initially objected to it. (*Id.* at p. 1245 [she "was not lied to, placed under duress, or otherwise manipulated into signing the arbitration agreement"].) It then ruled failure to attach the arbitration rules was not an exacerbating feature of the adhesive contract because the plaintiff's unconscionability claim was not based on the substance of the AAA rules, themselves. (*Id.* at p. 1246.)

Following *Baltazar*, the Court of Appeal in *Nyugen*, also rejected an argument that failure to attach arbitration rules elevated the procedural unconscionability of an adhesive employment agreement. The plaintiff did not "claim he was lied to or otherwise manipulated into signing" the form employment application, but asserted failure to attach the AAA rules heightened the procedural unconscionability of the agreement, militating " 'closer scrutiny' " of its substantive fairness. (*Nyugen*, *supra*, 4 Cal.App.5th at pp. 248–249.) The appellate court disagreed—"*Baltazar* removed the nonprovision or nonattachment of the AAA rules as a basis for increasing the procedural unconscionability level." (*Id.* at p. 249.)

Here, as in *Baltazar* and *Nyugen*, Farrar cannot reasonably claim to be "surprised" by the arbitration provision in the final offer letter. She received the offer letter before she commenced work, so she "knew about the arbitration agreement." (*Baltazar*, *supra*, 62 Cal.4th at p. 1245.) The arbitration provision was clearly set forth in the final offer letter and easily read. (See *Sanchez*, *supra*, 61 Cal.4th at p. 914 [business "was under no obligation to highlight the arbitration clause . . . nor was it required to specifically call that clause to [the plaintiff's] attention"].) The provision was also largely the same as the

10

arbitration provision in the initial offer letter. While Farrar claims there were significant differences between the arbitration paragraphs in the initial and final offer letters, that is not the case. The arbitration provision in the final offer letter replaced AAA with ADR, an equally well-known and reputable provider, added breach of contract claims to what was merely an illustrative list of claims subject to an inclusive arbitration provision with two specific exceptions, which remained the same, and made a slight modification in the title of the confidentiality agreement.

Nor, on this record, can Farrar point to the claimed failure to provide her with a copy of the confidentiality agreement referenced in the arbitration provision as a basis for heightened substantive scrutiny. The confidentiality agreement was referenced in three different sections of both the initial and final offer letter— paragraph eight (entitled "Confidential Information"), paragraph 13 (entitled "Arbitration"), and the final paragraph above the signature block. When Hanavan e-mailed Farrar the initial offer letter, he expressly invited her to call him if she wanted to discuss the proposal, and the parties thereafter continued to negotiate the agreement. Thus, Farrar had every opportunity to obtain a copy of the confidentiality agreement, and there is no evidence she ever asked for a copy and was refused.[2]

In sum, on this record, there is no evidence of "oppression" or "sharp practices," on the part of the company. Accordingly, heightened scrutiny of the arbitration provision is not warranted.

### *Substantive Unconscionability*

In recent years, the Supreme Court has discussed substantive unconscionability at some length. (See *Baltazar*, *supra*, 62 Cal.4th at pp. 1246–1250; *Sanchez*, *supra*, 61 Cal.4th at pp. 915–922; *Armendariz*, *supra*, 24 Cal.4th at pp. 113–121.)

---

[2] Farrar claims in passing in her respondent's brief that she is challenging the substance of ADR's rules and of the confidentiality agreement. But, she has provided no analysis or discussion in that regard. Rather, she asserts the fact copies of the rules and the confidentiality agreement were not attached to the final offer letter heightens its procedural unconscionability, an assertion we reject in light of *Baltazar* and *Nyugen*.

11

" 'The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " (*Stirlen* [, *supra*,] 51 Cal.App.4th [at p.] 1532 . . . ), " 'unduly oppressive' " (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925 . . .), " 'so one-sided as to "shock the conscience" ' " (*Pinnacle* [, *supra*,] 55 Cal.4th [at p.] 246 . . .), or "unfairly one-sided" (*Little* [*v. Auto Stiegler, Inc.* (2003)] 29 Cal.4th [1064,] 1071 . . .). All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" (*Schnuerle v. Insight Communications Co.* (Ky.2012) 376 S.W.3d 561, 575 . . .), but with terms that are "unreasonably favorable to the more powerful party" (8 Williston on Contracts (4th ed. 2010) § 18:10, p. 91). These include "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." (*Ibid.*)' " (*Baltazar*, *supra*, 62 Cal.4th at pp. 1244–1245, quoting *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1145 (*Sonic II*).)

Accordingly, "[a] party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain. Not all one-sided contract provisions are unconscionable; hence the various intensifiers in our formulations: 'overly harsh,' 'unduly oppressive,' 'unreasonably favorable.' (See *Pinnacle*, *supra*, 55 Cal.4th at p. 246 ['A contract term is not substantively unconscionable when it merely gives one side a greater benefit . . . .'].)" (*Sanchez*, *supra*, 61 Cal.4th at p. 911, italics omitted.)

"An evaluation of unconscionability is highly dependent on context. (See *Williams v. Walker–Thomas Furniture Co.* (D.C. Cir. 1965) 121 U.S. App.D.C. 315 . . . ['The test is not simple, nor can it be mechanically applied.'].) The doctrine often requires inquiry into the 'commercial setting, purpose, and effect' of the contract or

12

contract provision.  (Civ. Code, § 1670.5, subd. (b); accord, *Sonic II*, *supra*, 57 Cal.4th at pp. 1147–1148; *Walker–Thomas Furniture*, at p. 450 [unconscionability must 'be considered "in the light of the general commercial background and the commercial needs of the particular trade or case" '].)"  (*Sanchez*, *supra*, 61 Cal.4th at pp. 911–912; see *Sonic II*, *supra*, 57 Cal.4th at p. 1146 ["the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided"].)

### *The "Carve-Out" for Confidentiality Claims*

Farrar claims the arbitration provision is substantively unconscionable because of what she calls the "carve-out" for "any claim based on or related to the and Assignment of Inventions & Confidentiality Agreement between you and Direct Commerce."  Farrar maintains this exception makes the arbitration provision unduly one-sided because these are the claims the company is most likely to bring, whereas the claims she is most likely to bring must be arbitrated.  She cites *Armendariz* as dispositive on this point.

This oversimplifies *Armendariz*.  In that case, the arbitration provision "was limited in scope to employee claims regarding wrongful termination." (*Armendariz*, *supra*, 24 Cal.4th at p. 120.)  "Although it did not expressly authorize litigation of the employer's claims against the employee . . . such was the clear implication of the agreement."  (*Ibid*.)  "The unconscionable one-sidedness of the arbitration agreement" was "compounded" by the fact it did "not permit the full recovery of damages for employees, while placing no such restriction on the employer."  (*Id.* at p. 121.)  Thus, *Armendariz* did not deal with an otherwise encompassing arbitration provision with a carve-out, but rather, dealt with a narrow arbitration provision that pertained solely to employee claims and also curtailed employee remedies.

However, as we have observed, *Armendariz* cites favorably to *Stirlen*, and in *Stirlen* the arbitration provision included a carve-out for certain claims, including "those relating to the protection of the employer's intellectual and other property."  (*Armendariz*, *supra*, 24 Cal.4th at p. 116.)  That was not all, however.  The arbitration provision also excluded "enforcement of a postemployment covenant not to compete," required the

employee to waive any jurisdictional challenge to litigation commenced in state or federal court, limited any damages recovered by the employee to " ' "actual damages for breach of contract, less any proper offset for mitigation," ' " and provided that upon the filing of an arbitration claim, payments of any salary and benefits would "cease ' "without penalty to the Company," ' pending the outcome of the arbitration." (*Ibid.*)  It additionally included a one-year limitations period for all arbitral claims, stated no equitable doctrines could toll that period, and limited the powers of the arbitrator. (*Stirlen*, *supra*, 51 Cal.App.4th at p. 1529.)

The Court of Appeal characterized the employer as "[i]mplicitly conceding" the "manifest one-sidedness" of the provision (*Stirlen*, *supra*, 51 Cal.App.4th at p. 1534), and the Supreme Court in *Armendariz* described the lower appellate court as concluding the provision lacked "even the 'modicum' " of bilaterality.  (*Armendariz*, *supra*, 24 Cal.4th at p. 116.)  The Supreme Court, thus, summarized *Stirlen* as a case in which "[t]he employee pursuing claims against the employer had to bear not only with the inherent shortcomings of arbitration—limited discovery, limited judicial review, [and] limited procedural protections—but also significant damage limitations."  (*Armendariz*, at p. 116.)  "The employer, on the other hand, in pursuing its claims, was not subject to these disadvantageous limitations and had written into the agreement special advantages, such as the waiver of jurisdictional objections by the employee if sued by the employer." (*Ibid.*)

The arbitration provision at issue here is not limited to employee wrongful termination claims, as in *Armendariz*.  Nor is it laden with the panoply of employer-favorable provisions that stacked the deck in *Stirlen*.  (See *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 247 (*Carbajal*) [arbitration provision allowed employer to obtain injunctive relief, waived bond requirement, waived right to attorney fees if employee prevailed on Labor Code claims, provided employer with unilateral right to appeal any arbitral ruling contrary to class action waiver].)  It does, however, contain an express exception for "any claim" based on the confidentiality agreement.  (It also

14

excludes claims under the worker's compensation law, an exception to which Farrar has no objection.)

In *Baltazar*, the Supreme Court considered whether a provision allowing " 'either party hereto may apply to a California court for any provisional remedy' " rendered the arbitration agreement substantively unconscionable because the employer was far more likely to avail itself of provisional judicial remedies, for example, in connection with a trade secret claim or claim involving confidential information. (*Baltazar*, *supra*, 62 Cal.4th at pp. 1241, 1246–1247.) The court concluded this provision did no more than restate the law, which allows for provisional judicial remedies in connection with arbitral claims, and did not place the plaintiff at "an unfair disadvantage" even if such remedies were more likely to be sought by the employer. (*Id.* at p. 1248.)

The court also concluded providing that, during the course of an arbitration, the parties would take " 'all necessary steps' " to protect the company's trade secrets and proprietary information, was not substantively unfair, even if it benefited the employer, rather than the employee. (*Baltazar*, *supra*, 62 Cal.4th at p. 1250.) " ' "[A] contract can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." ' Here, the basis for the extra measure of protection is a legitimate commercial need to protect Forever 21's 'valuable trade secrets and proprietary and confidential information' from public disclosure. Although Baltazar may dislike the wording of the confidentiality provision, she does not dispute that it is based on a legitimate commercial need." (*Ibid.*; see *Sanchez*, *supra*, 61 Cal.4th at pp. 921–922 [retention of "self-help" remedies, such as repossession, did not contribute to the unconscionability of an adhesive auto sales contract; "remedy of repossession of collateral is an integral part of the business of selling automobiles on credit and fulfills a ' "legitimate commercial need" ' " ], quoting *Armendariz*, *supra*, 24 Cal.4th at p. 117].)

Thus, here, if the carve-out for claims arising out of the confidentiality agreement were limited to securing provisional judicial remedies, under *Baltazar*, it could not be considered substantively unconscionable at all. However, the exception is for more than

15

immediate, provisional judicial remedies—it wholly excludes claims arising out of the confidentiality agreement from arbitration.

While a contract " ' "can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable" ' " (*Baltazar*, *supra*, 62 Cal.App.4th at p. 1250, quoting *Armendariz*, *supra*, 24 Cal.4th at p. 117), several courts have concluded a complete carve-out for confidentiality-related claims results in unfair one-sidedness.  In *Stirlen*, for example, the arbitration provision excluded claims pertaining to patent infringement, improper use of confidential information and competition.  (*Stirlen*, *supra*, 51 Cal.App.4th at p. 1536.)  The employer claimed " '[s]imple business realities underscore a need for this type of immediate access to court-ordered relief, which is simply not present in the context of the standard employment dispute.' " (*Ibid.*)  While the court acknowledged that might justify a need for provisional judicial relief, such relief was already secured by Code of Civil Procedure section 1281.8, subdivision (b).  (*Stirlen*, at p. 1537.)  It could not justify a complete exclusion of infringement and confidentiality claims.  (*Ibid.*; see *Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 634–635 (*Carlson*) [arbitration provision excluded employer claims seeking to enforce anticompetitive covenants and confidentiality provisions; thus, employer was "exempt from having to arbitrate its most likely claims" against the employee, whereas employee "was required to relinquish her access to the courts for all of her nonstatutory claims"].)

We therefore conclude substantive unconscionability is present in the case at hand, given that the carve-out is not limited to provisional judicial remedies as was the case in *Baltazar*, but instead is a wholesale exception for "any claim based on or related to the and Assignment of Inventions & Confidentiality Agreement between you and Direct Commerce."

### *Severability*

Civil Code section 1670.5, subdivision (a) provides:  "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the

16

time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Comment two of the Legislative Committee comment on the statutes states: "Under this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results." (Cal. Civ. Code, § 1670.5, Legis. Comm. Comments, n. 2.)

Thus, as the Supreme Court observed in *Armendariz*, while a trial court has considerable discretion with respect to severability, the statute contemplates that refusal to enforce an agreement altogether should be limited to situations where the agreement is " 'permeated' " by unconscionability. (*Armendariz*, *supra*, 24 Cal.4th at p. 122.) The court analogized to the law governing severance of illegal contract provisions. "Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Id.* at p. 124.)

The high court concluded two factors in *Armendariz* weighed against severance of the provisions rendering the arbitration agreement unconscionable. First, the agreement contained "more than one unlawful provision"—i.e., it was wholly unilateral, requiring only the employee to arbitrate her claims, and it had an "unlawful damages provision" that attempted to limit any damages the employee recovered. (*Armendariz*, *supra*, 24 Cal.4th at p. 124.) "Such multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." (*Ibid.*) Second, "in the case of the agreement's lack of mutuality, such permeation is indicated by the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint

17

from the agreement. Rather, the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms." (*Id.* at pp. 124–125.) This was so because the arbitration provision was limited to employee claims, and thus would have had to have been rewritten and expanded to also include employer claims. (See *id.* at pp. 91–92, 120–121.)

Other cases in which severance has been denied have also involved arbitration provisions with numerous unconscionable features. (E.g., *Carbajal*, *supra*, 245 Cal.App.4th at pp. 247, 254 [arbitration agreement contained "three substantively unconscionable terms"]; *Carlson*, *supra*, 239 Cal.App.4th at pp. 634–636, 639–640 [in addition to excluding employer claims based on anticompetitive covenants and confidentiality provisions, there were "other one-sided provisions"].)

As we have explained, the arbitration provision in the instant case is afflicted with only one substantively unconscionable provision, the exception for claims arising from the confidentiality agreement (as we have noted, Farrar does not challenge the exception for worker's compensation claims). The provision otherwise applies to "any dispute" that "arises relating to your employment or its termination," and broadly states, "[t]he types of claims that are subject to arbitration will include, but will not be limited to, breach of contract, claims of improper termination of employment, claims of unlawful discrimination and claims of sexual or other forms of harassment." This language is similar to that in the arbitration provision at issue in *Baltazar*, which the Supreme Court held was not one-sided and by its plain terms made "clear that the parties mutually agree[d] to arbitrate all employment-related claims." (*Baltazar*, *supra*, 62 Cal.4th at p. 1249.)

Thus, in this case, the one aspect in which the arbitration provision is substantively unconscionable is readily remedied—by severing out the exception for claims arising from the confidentiality agreement. This is not a case in which the arbitration provision is "permeated" by unconscionability and, thus, would have to be "reformed" in order to eliminate unconscionability. (See *Armendariz*, *supra*, 24 Cal.4th at p. 125.) Nor does severing out the offending carve-out result in an agreement contrary to that intended by

Direct Commerce.  The company retains its statutory rights under the Code of Civil Procedure section 1281.8, subdivision (b) to seek provisional judicial remedies pending arbitration, satisfying any need for "quick judicial intervention" to "safeguard" its "proprietary information."  We therefore conclude, on this record, the trial court abused its discretion in refusing to sever out the offending exception for claims arising from the confidentiality agreement.

*The* **Armendariz** *Cost Issue*

For the first time on appeal, in her respondent's brief, Farrar maintains the arbitration provision should not be enforced because it does not meet the enforceability requirements set forth in *Armendariz* for mandatory employment arbitration agreements that pertain to unwaivable statutory rights—and specifically, the requirement that an employee not pay costs unique to arbitration.  (*Armendariz*, *supra*, 24 Cal.4th at pp. 110–113.)  That Farrar did not make this argument in the trial court is understandable, given that the bulk of her allegations concern an alleged breach of her employment agreement and not an alleged violation of unwaivable statutory rights and, moreover, the alleged breach of contract is the predicate for her claimed failure to timely pay wages.  Although we could disregard this belatedly raised contention as being waived, *Armendariz* provides a ready roadmap as to how to address it.[3]

In *Armendariz*, the arbitration provision had no "specific provisions on arbitration costs."  (*Armendariz*, *supra*, 24 Cal.4th at p. 113.)  Accordingly, to foreclose any possibility that the former employees might be subject to costs over and above what they would incur in pursuing their claims in court, the Supreme Court "interpret[ed] the arbitration agreement . . . as providing"—consistent with the court's holding that a mandatory arbitration agreement covering FEHA (California Fair Employment and

---

[3] Merely because an issue is one of law, does not give a party license to raise it for the first time on appeal, as Farrar appears to suggest.  Whether an appellate court will entertain a belatedly raised legal issue always rests within the court's discretion.  (*Poet, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 750–751.)

19

Housing Act[4]) claims "impliedly obliges the employer to pay all types of costs that are unique to arbitration"—that "the employer must bear the arbitration forum costs." (*Ibid.*) Notably, the court resolved this issue independently of, and, indeed, prior to, considering whether the arbitration agreement was substantively unconscionable. (See *id.* at pp. 113–127.)

Here, the arbitration provision also has no "specific provisions on arbitration costs."[5] (*Armendariz*, *supra*, 24 Cal.4th at p. 113.) Following the approach used by the Supreme Court in *Armendariz*, we interpret the arbitration provision as impliedly providing that "the employer must bear the arbitration forum costs." (*Ibid.*; see *Nguyen*, *supra*, 4 Cal.App.5th at pp. 255–256 [affirming ruling that the defendant employer " 'pay all the costs of the arbitration other than those the plaintiff would necessarily pay in a court proceeding' "].)

### DISPOSITION

The order denying Direct Commerce's petition to compel arbitration is reversed and the matter remanded with directions to sever the exception for claims arising from the confidentiality agreement, declare an implied requirement that Direct Commerce bear arbitration forum costs, and grant the company's petition to compel arbitration. Parties to bear their own costs on appeal.

---

[4] Government Code section 12900 et seq.

[5] Rather, Farrar points to the ADR general arbitration rules as potentially making her jointly and severally liable for the costs of arbitration. There is no impediment, however, to a more specific, implied contractual requirement that an employer bear the arbitration forum costs in cases involving nonwaivable statutory rights.

20

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.


A146944, *Farrar v. Direct Commerce, Inc.*

21

Trial Court: San Francisco City and County Superior Court

Trial Judge:   Hon. Harold E. Kahn

Counsel:

Sheppard, Mullin, Richter & Hampton LLP, Littler Mendelson, Nancy E. Pritikin and Krista Stevenson Johnson for Defendant and Appellant.

McGuinn, Hillsman & Palefsky, Cliff Palefsky and Scott M. Stillman for Plaintiff and Respondent.