Filed 2/16/24  TMG Placerville v. City of Placerville CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| TMG PLACERVILLE LLC, | C095605 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20200631) |
| v. | |
| CITY OF PLACERVILLE et al., | |
| Defendants and Respondents; | |
| PVILLE CA LLC et al., | |
| Real Parties in Interest and Respondents. | |

TMG Placerville LLC (TMG) applied for a permit to operate a retail cannabis store in the City of Placerville (City).  The City awarded permits to three other applicants, including real parties in interest Conscious Consulting and Yoga, Inc. (dba Chuck's Cannabis Collective) (Chuck's) and JSCR Management LLC (dba Reserve House)

1

(Reserve House).  The City also identified three alternates in the event the permittees did not begin operations within 12 months.  TMG was not awarded a permit or selected as an alternate.

TMG appealed to the City Council of the City of Placerville (City Council), arguing the City's four-part process for awarding permits was unfair and failed to comply with the City's cannabis ordinance.  (Placerville Mun. Code, §§ 5-28-1 through 5-28-51; the Ordinance.)[1]  Among other things, TMG argued Chuck's and Reserve House should have been disqualified for submitting incomplete applications in the first phase of the selection process (Phase One) and should not have been given the opportunity to challenge scores they received from the City's designee in the second phase (Phase Two).

The City Council found the interim challenges of Chuck's and Reserve House to their Phase Two scores were "not specifically authorized" by the Ordinance, and "may have resulted in unknown and unquantifiable harms to other applicants."  However, the City Council also found the "potential errors and irregularities" in the Phase Two scoring and associated interim challenges "were not so fundamental that they resulted in prejudice to other applicants."  Accordingly, the City Council concluded permits should still be awarded to Chuck's, Reserve House, and a third applicant, real party in interest Pville CA, LLC (dba Sacred Roots) (Sacred Roots).

TMG brought a petition for writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5.[2]  The trial court denied the petition.  We will affirm.

## I.  BACKGROUND

The Medicinal and Adult-Use Cannabis Regulation and Safety Act (Bus. & Prof. Code, § 26000 et seq.; the Act) authorizes the local licensure and regulation of cannabis

---

[1] References to "Mun. Code" are to the Placerville Municipal Code.

[2] Undesignated statutory references are to the Code of Civil Procedure.

businesses.  (Bus. & Prof. Code, § 26200.)  The Ordinance implements the provisions of the Act by regulating commercial cannabis activity within City limits.  As relevant here, the Ordinance requires that all commercial cannabis operators obtain and annually renew permits to operate within the City.  (Mun. Code, §§ 5-28-3 and 5-28-13.)  A subsequent resolution provides that no more than three cannabis retailers may operate within the city at any one time.

## A.   *The Application and Selection Process*

The Ordinance directs the city manager to establish "the procedures to govern the application process, and the manner in which the decision will ultimately be made regarding the issuance of any commercial cannabis business permit(s)."  (Mun. Code, § 5-28-9(A).)  The Ordinance authorizes the city manager and/or his designee to "prepare the necessary forms, adopt any necessary rules to the application, regulations and processes, solicit applications, [and] conduct initial evaluations of the applicants."  (*Ibid.*)  The city manager established a four-phase application and selection procedure.  We briefly describe each phase below.

### 1.   *Phase One (Application Submittal and Determination of Eligibility)*

Phase One, entitled "Application Submittal and Determination of Eligibility," required that applicants submit completed applications and supporting documents, including criminal history checks, indemnification agreements, and zoning verification letters.  The City received 13 applications, all of which were deemed complete.  As we shall discuss, TMG asserts applications submitted by Chuck's and Reserve House were incomplete and should have been disqualified.

### 2.   *Phase Two (Application Evaluation and Initial Ranking)*

Applicants approved in Phase One advanced to Phase Two, entitled "Application Evaluation and Initial Ranking."  In Phase Two, applications were evaluated and ranked by the City's consultant, HdL Companies (HdL), according to specific criteria, including location, business plan, and neighborhood compatibility plan.  Applicants were awarded

points for meeting these criteria and were required to earn at least 80 percent of a possible 1,500 points to advance to the third phase (Phase Three).

Of the original 13 applicants, four did not earn enough points to satisfy the 80 percent threshold. Three of those applicants, including Chuck's and Reserve House, appealed their initial scores to the city manager. All three were then awarded additional points. Only Chuck's received enough points to advance to Phase Three. Reserve House appealed further to the City Council. The City Council heard the appeal and awarded Reserve House enough points to advance to Phase Three. As we shall discuss, TMG argues the City should not have allowed Chuck's and Reserve House to challenge their initial scores but should instead have disqualified them at Phase Two (if not Phase One).

### 3. *Phase Three (Interviews and Second Ranking)*

Eleven applicants advanced to Phase Three, entitled "Interviews and Second Ranking." In Phase Three, each applicant was interviewed and evaluated by the City's selection committee, which consisted of the City's development services director, a current councilmember, a former councilmember, and the commander of the City's police department. As before, applicants were evaluated based upon weighted criteria, this time with as many as 2,300 points at stake. After all points from Phase Three were tabulated, they were combined with points from Phase Two to establish an overall ranking. Applicants who received at least 80 percent of the total possible 3,800 points advanced to the fourth and final phase (Phase Four).

### 4. *Phase Four (City Manager Final Approval and Issuance of Local Permit)*

All 11 remaining applicants advanced to Phase Four, entitled "City Manager Final Approval and Issuance of Local Permit." In Phase Four, the city manager reviewed information collected in the previous phases and met with members of the selection committee to review their comments and recommendations. The city manager then selected three applicants to be awarded permits and three alternates, all subject to appeal to the City Council. As noted, the city manager awarded permits to Sacred Roots,

4

Chuck's, and Reserve House. TMG, which was ranked ninth overall, was not awarded a permit or selected as an alternate.

B.      *TMG Appeals to the City Council*

Four unsuccessful applicants—including TMG—appealed the City Manager's selections to the City Council. As relevant here, TMG argued Chuck's and Reserve House submitted incomplete applications and should have been disqualified in Phase One. TMG also argued Chuck's and Reserve House should not have been allowed to challenge their Phase Two scores during the selection process. According to TMG, these "mid-procedure appeals" were not authorized by the Ordinance or application procedures and conferred an unfair advantage on winning applicants Chuck's and Reserve House.

The City Council conducted public hearings on the appeals in July 2020. The City Council found only the lowest scoring applicants in Phase Two were given an opportunity to appeal their scores to the city manager (as was the case with Chuck's and Reserve House) and could then appeal to the City Council (as was the case with Reserve House). The City Council further found: "The Mid-Procedure Appeal of Initial Scoring is not specifically authorized by the Cannabis Ordinance and thus failed to strictly conform to the Cannabis Ordinance procedures. Additionally, not all applicants were given the same opportunity to appeal their Initial Scoring." "As such," the City Council continued, "the Mid-Procedure Appeals may have resulted in unknown and unquantifiable harms to other applicants." The City Council further found that "there may have been errors in the Initial Scoring of applicants' applications [by HdL], which may have resulted in inaccurate or unfair scoring of certain applicants." The City Council granted the appeals in part and concluded further consideration was needed before reaching decisions on final permit issuance.

The City Council convened a special meeting in August 2020. City staff presented a report outlining possible next steps in the selection process. Options included restarting the application and selection process, issuing a single permit to the highest-ranking

5

applicant (Sacred Roots), confirming the city manager's selection, or issuing additional permits without restarting the selection process. TMG and other appellants appeared at the hearing. They opposed restarting the application and selection process and urged the City Council to approve the issuance of additional permits.

The City Council heard from John Clerici, a member of the selection committee. Clerici offered two important pieces of information. First, he said the selection committee was not aware of the results from Phase Two when they conducted their interviews and rankings for Phase Three. Thus, the selection committee did not know how any of the applicants were scored or ranked in Phase Two. Second, Clerici said the selection committee's vote as to the top three applicants was unanimous, and essentially the same as HdL's ranking, except two of the three applicants switched places.

The City Council also heard from city manager Cleve Morris, who was responsible for making the final selection in Phase Four. Morris explained that he spoke with members of the selection committee and asked them to explain and justify their recommendations before making his decision.

Following further public comment and deliberation, the City Council found that any procedural errors were not so fundamental as to result in prejudice to unsuccessful applicants. Accordingly, the City Council voted to award permits to Sacred Roots, Chuck's, and Reserve House, as recommended by the selection committee and consistent with the city manager's decision. The City Council also approved three alternates, also as recommended by the selection committee and consistent with the city manager's decision.

The City Council adopted a resolution to this effect in September 2020. As relevant here, the resolution contains the following finding: "The potential errors and irregularities in the Phase [Two] Initial Scoring and Mid-Procedure Appeals . . . were not so fundamental that they resulted in prejudice to other applicants because the subsequent Phase [Three] process cured any potential errors or irregularities. Specifically, the City

6

Council finds that all applicants in Phase [Three] were independently interviewed and evaluated by the City's Selection Committee, which evaluation was not based on, added to, or tainted by reference to the Phase [Two] Initial Scoring or any adjustment or outcome that resulted from the Mid-Procedure appeals. The City Council, therefore, finds that any potential errors, irregularities, or unfairness that occurred prior to Phase [Three] became irrelevant in Phase [Three], and did not prejudice the applicants in the remaining evaluation and selection process."

C.      *Trial Court Proceedings*

TMG filed a petition for writ of mandate and complaint for declaratory and injunctive relief on December 15, 2020. The petition seeks a writ of mandate ordering the City to set aside the permits and comply with the Ordinance pursuant to section 1085 and/or section 1094.5. The City answered the petition.

The parties and real parties in interest submitted briefs and appeared for a court trial on the merits.[3] In anticipation of argument, the trial court issued a tentative ruling finding, inter alia, that (1) TMG waived any claim for writ relief under section 1085, (2) the City did not abuse its discretion by accepting incomplete applications from Chuck's and Reserve House in Phase One, and (3) the City Council's finding that mid-procedure appeals by Chuck's and Reserve House did not prejudice any other applicant was supported by substantial evidence. Following argument, the trial court adopted the tentative ruling as the order of the court. The trial court entered judgment in the City's favor in July 2021. This appeal timely followed.

---

[3] As we shall discuss, TMG's opening brief argued exclusively for a writ of administrative mandate pursuant to section 1094.5. TMG made no mention of traditional mandamus or section 1085.

7

## II.  DISCUSSION

### A.    *Forfeiture*

We begin with the question of forfeiture.  As noted, the petition seeks a traditional writ under section 1085 and/or a writ of administrative mandate under section 1094.5.  TMG's briefing in the trial court focused exclusively on section 1094.5 and said nothing about section 1085.  The trial court found TMG waived any claim for writ relief under section 1085, and TMG does not make any serious attempt to challenge that determination on appeal.[4]  Indeed, TMG's opening brief does not even acknowledge the waiver ruling and thus gives us no reason to disturb it.  (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1150 [absent argument that the trial court's conclusion was erroneous, appellate court will not reverse on the point]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631-632 [trial court's ruling is presumed correct and burden is on appellant to demonstrate error].)

This would ordinarily be the end of our discussion of section 1085.  " 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.  This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.' " (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.)  "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider.  [Citation.]  In our adversarial system, each party has the obligation to raise any issue or infirmity that might

---

[4] The conceptual difference between waiver and forfeiture is not important in this context.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 ["the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim"].)

subject the ensuing judgment to attack. [Citation.] Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.) Having failed to argue for traditional writ relief in the trial court, and having failed to challenge the trial court's waiver ruling, TMG has twice forfeited any claim for relief under section 1085. And yet, TMG has made the same forfeited claim the central premise of the present appeal.

Rather than challenge the denial of the petition for writ of administrative mandate under section 1094.5, TMG argues the trial court should have granted the petition for a traditional writ under section 1085. Again, TMG does not even acknowledge the waiver ruling, let alone explain why it was incorrect. We could affirm the trial court's judgment on this basis alone. But even exercising our discretion to consider TMG's forfeited arguments, we would conclude they lack merit. (*Fort Bragg Unified School District v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907 ["a new theory raising a pure question of law on undisputed facts can be raised for the first time on appeal"]; *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1275, fn. 3 ["Whether an appellate court will entertain a belatedly raised legal issue always rests within the court's discretion"].)

B.      *Applicable Legal Principles and Standard of Review*

A traditional writ of mandate lies "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station." (§ 1085, subd. (a); see *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 ["Mandamus will lie to compel a public official to perform an official act required by law"].) To obtain relief, the petitioner must establish the existence of a public officer's or a public entity's "clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty." (*California Assn. of Professional Scientists v.*

9

*Department of Finance* (2011) 195 Cal.App.4th 1228, 1236; see *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653.)

Writ relief may be available in two circumstances, both of which are relevant here. (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 344 ["mandamus may issue to compel the performance of a ministerial duty or to correct an abuse of discretion"].)  First, "[a] court may issue a writ of mandate to compel a public agency or officer to perform a mandatory duty.  [Citation.]  'This type of writ petition "seeks to enforce a mandatory and ministerial duty to act on the part of an administrative agency or its officers." '  [Citation.]  ' "The writ will not lie to control discretion conferred upon a public officer or agency." ' "  (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 914.)  Under this theory of relief, "[m]andamus may issue . . . to compel an official both to exercise his discretion (if he is required to do so) and to exercise it under a proper interpretation of the applicable law."  (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.)  "Often, the crucial issue when the petitioner seeks such relief is whether the act that the petitioner seeks to compel is a *mandatory and ministerial* duty, or, on the contrary, is a *quasi-legislative and discretionary* act.  ' " '[I]n most cases, the appellate court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference.  This question is generally subject to de novo review on appeal because it is one of statutory interpretation, a question of law for the court.' " ' "  (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 279 (*CV Amalgamated*).)

"Second, a court may issue a writ when a public agency has abused its discretion in carrying out a *discretionary* function.  'Although traditional mandamus will not lie to compel the exercise of discretion in a particular manner, it is a proper remedy to challenge agency discretionary action as an abuse of discretion.' "  (*CV Amalgamated, supra*, 82 Cal.App.5th at p. 279.)  " 'When a court reviews a public entit[y's] decision for an abuse of discretion, the court may not substitute its judgment for that of the public

10

entity, and if reasonable minds may disagree as to the wisdom of the public entity's discretionary determination, that decision must be upheld. [Citation.] Thus, the judicial inquiry . . . addresses whether the public entity's action was arbitrary, capricious or entirely without evidentiary support, and whether it failed to conform to procedures required by law.' " (*Id.* at p. 280.)

"With respect to both theories of writ relief, '[w]hen an appellate court reviews a trial court's judgment on a petition for a traditional writ of mandate, it applies the substantial evidence test to the trial court's findings of fact and independently reviews the trial court's conclusions on questions of law, which include the interpretation of a statute and its application to undisputed facts.' " (*CV Amalgamated, supra*, 82 Cal.App.5th at p. 280.)

C.      *Mandatory and Ministerial Duty*

TMG argues the City had a mandatory duty to disqualify Chuck's and Reserve House for submitting incomplete applications in Phase One of the selection process. The trial court rejected a variation of this argument, offered in the context of TMG's now-abandoned request for writ of administrative mandate. The argument fares no better here.

As noted, the Ordinance directs the city manager to establish "the procedures to govern the application process, and the manner in which the decision will ultimately be made regarding the issuance of any commercial cannabis business permit(s)." (Mun. Code, § 5-28-9(A).) With respect to applications, the Ordinance provides: "The City reserves the right to reject any and all applications." (Mun. Code, § 5-28-9(E).) The Ordinance further provides: "The City further reserves the right to request and obtain additional information from any candidate submitting an application." (*Ibid.*) And lastly, the Ordinance provides that, "an application *risks* being rejected" for any of several reasons, including being "received after [the] designated time and date" and "not containing the required elements." (*Ibid.*, emphasis added.) As the trial court observed,

11

the Ordinance "says nothing about automatically disqualifying an applicant for an application that is initially incomplete."

The City's application procedures are much the same. They provide, in part that, "Late or incomplete applications MAY BE REJECTED." They further provide: "an application RISKS BEING REJECTED" for various reasons, including that the application is incomplete. Neither the Ordinance nor the application procedures impose a mandatory or ministerial duty on the City to disqualify applicants for submitting incomplete applications in Phase One.

## D. *Abuse of Discretion*

TMG argues the City abused its discretion by allowing Chuck's and Reserve House to challenge their Phase Two scores during the middle of the selection process. According to TMG, the Ordinance does not authorize mid-process appeals, and the City acted arbitrarily and capriciously in allowing them. We need not resolve this question. Even assuming the City violated the Ordinance, TMG was required to show resulting prejudice. (*Gordon v. Horsley* (2001) 86 Cal.App.4th 336, 351.) The City Council found TMG suffered no actual prejudice, and the trial court determined that finding was supported by substantial evidence. TMG has not carried its burden to show the trial court erred.

While "traditional mandate will lie to correct abuses of discretion, a party seeking review under traditional mandamus must show the public official or agency invested with discretion acted arbitrarily, capriciously, fraudulently, or without due regard for his rights, *and that the action prejudiced him*." (*Gordon v. Horsley, supra*, 86 Cal.App.4th at p. 351, emphasis added; see also *California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1449 ["When a party seeking a writ of traditional mandamus has established an abuse of discretion, the issuance of the writ is not automatic. That party must also show prejudice resulted from the public agency's action"].)

12

Here, the City Council readily conceded the mid-process appeals were "not specifically authorized by the Cannabis Ordinance and thus failed to strictly conform to the Cannabis Ordinance procedures." The City Council also acknowledged they "may have resulted in unknown and unquantifiable harms to other applicants." TMG spends considerable time on these points. However, what matters, for our purposes, is what happened next.

As previously discussed, the City Council convened a special meeting to consider possible solutions to the problems with the selection process. The City Council heard evidence from Clerici, a member of the selection committee, who said the committee was not aware of the results from Phase Two when they conducted their interviews and rankings for Phase Three, and the rankings for Phase Three were unanimous, and essentially the same as the rankings for Phase Two. The City Council also heard from Morris, who testified that he spoke with members of the selection committee and asked them to explain and justify their recommendations before making his Phase Four decision.

Based on the foregoing, the City Council found: "The potential errors and irregularities in the Phase [Two] Initial Scoring and Mid-Procedure Appeals . . . were not so fundamental that they resulted in prejudice to other applicants because the subsequent Phase [Three] process cured any potential errors or irregularities." "Specifically," the City Council found, "all applicants in Phase [Three] were independently interviewed and evaluated by the City's Selection Committee, which evaluation was not based on, added to, or tainted by reference to the Phase [Two] Initial Scoring or any adjustment or outcome that resulted from the Mid-Procedure appeals." Accordingly, the City Council concluded that, "any potential errors, irregularities, or unfairness that occurred prior to Phase [Three] became irrelevant in Phase [Three], and did not prejudice the applicants in the remaining evaluation and selection process."

13

The trial court determined that substantial evidence supported these findings, and TMG does not really suggest otherwise. Instead, TMG argues there was substantial evidence to support the conclusion that unsuccessful applicants were, in fact, prejudiced by the mid-process appeals. Specifically, TMG asserts the mid-process appeals conferred unfair advantages to Chuck's and Reserve House by giving them "face-time" with the city manager and allowing them to continue the selection process when they otherwise would have been disqualified. These arguments do not establish error. At most, they suggest a conflict in the evidence. The trial court resolved that conflict in favor of the City. Applying the substantial evidence standard of review, we conclude ample evidence supports the trial court's determination that TMG was not prejudiced by any procedural irregularity in the selection process.

## III. DISPOSITION

The judgment is affirmed. The City of Placerville, Pville CA LLC (dba Sacred Roots), JSCR Management LLC (dba Reserve House), and Conscious Consulting and Yoga, Inc. (dba Chuck's Cannabis Collective) shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

_____

RENNER, J.

We concur:

/S/

_____

HULL, Acting P. J.

/S/

_____

MESIWALA, J.